WALT DISNEY PRODUCTIONS,
Plaintiff-Appellee,

v.

The AIR PIRATES et al.,
Defendants-Appellants.

Nos. 75–3116, 75–3243.

United States Court of Appeals,
Ninth Circuit.

Sept. 5, 1978.

Michael Stepanian (argued), A. Kirk McKenzie, (argued) of Michael Kennedy Law Firm, San Francisco, Cal., for defendants-appellants.

Frank D. Tatum, Jr. (argued) of Cooley, Godward, Castro, Huddleson & Tatum, San Francisco, Cal., for plaintiff-appellee.

Before CHAMBERS, CUMMINGS * and ANDERSON, Circuit Judges.

CUMMINGS, Circuit Judge.

This case involves the admitted copying of plaintiff Walt Disney Productions' ("Disney") cartoon characters in defendants' adult "counter-culture" comic books. The present defendants are three individuals and two business entities operated by them.[1] The complaint alleges that they infringed Disney copyrights, a Disney trademark and engaged in unfair competition, trade disparagement and interference with Disney's business.[2] Disney sought injunctive relief, destruction of infringing materials, damages, costs and attorney's fees.

The district court awarded Disney a temporary restraining order and subsequently granted its motion for a preliminary injunction, simultaneously issuing an opinion re-

---

* The Honorable Walter J. Cummings, United States Circuit Judge, Seventh Circuit, sitting by designation.

1. The individual defendants-appellants are Ted Richards, Dan O'Neill and Bobby London. The defendant organizations, The Air Pirates and Hell Comics, are also appellants. By stipulation, judgments were entered against individual defendants Gary Hallgran and Ronald E. Turner in May 1975 and they are not involved in this appeal.

2. Counts 1 through 7 were based on infringement of copyrights; Count 8 alleged infringement of a Disney trademark; Counts 9 and 10 alleged causes of action for unfair competition, trade disparagement an intentional interference with business. Count 11, which was added by amendment, alleged that defendants infringed Disney's copyrighted picture book entitled "Toby Tortoise and the Hare" involving the cartoon characters Toby Tortoise and Max Hare and others.

ported in 345 F.Supp. 108 (N.D.Cal.1972).[3] As Judge Wollenberg noted in his opinion, the basic facts are undisputed. He found as follows (at 109–110):

Plaintiff holds valid copyrights on the various works noted in the first seven causes of action.[4] The works protected by the copyrights comprise a series of cartoon drawings ranging from a single page to "book length." The cartoons depict the antics of characters created by plaintiff, with "balloons" over each of the characters' heads containing dialog. Cartoons are drawn to form a narrative.

According to plaintiff, defendants infringed Disney copyrights by copying the graphic depiction of over 17 characters.[5] Two of the characters are represented as insects, and the others as animals endowed with human qualities. Each character has a recognizable image.

The individual defendants have participated in preparing and publishing two magazines of cartoons entitled "Air Pirates Funnies."[6] The characters in defendants' magazines bear a marked similarity to those of plaintiff. The names given to defendants' characters are the same names used in plaintiff's copyrighted work. However, the themes of defendants' publications differ markedly from those of Disney. While Disney sought only to foster "an image of innocent delightfulness," defendants supposedly sought to convey an allegorical message of significance. Put politely by one commentator, the "Air Pirates" was "an 'underground' comic book which had placed several well-known Disney cartoon characters in incongruous settings where they engaged in activities clearly antithetical to the accepted Mickey Mouse world of scrubbed faces, bright smiles and happy endings." It centered around "a rather bawdy depiction of the Disney characters as active members of a free thinking, promiscuous, drug ingesting counterculture." Note, *Parody, Copyrights and the First Amendment*, 10 U.S.F.L.Rev. 564, 571, 582 (1976).

In awarding Disney a preliminary injunction, the district court held that Disney's graphic depictions were protectable under Section 3 of the then Copyright Act[7] as component parts of Disney's copyrighted work. Next, the defense of fair use was rejected because defendants had copied the substance of the Disney products. Finally, after balancing the competing interests of free speech and press versus "encouraging creation by protecting expression" of ideas as reflected in the Copyright Clause of the Constitution,[8] the district court held that the First Amendment did not bar the issuance of a preliminary injunction (at 115–116).

**3.** The opinion was released before plaintiff amended its complaint to add Count 11. The infringement alleged in that Count occurred despite the restraining order then in effect.

**4.** As the district court's August 6, 1975, order granting plaintiff's motion for summary judgment shows, it considered that plaintiff also held a valid copyright on "The Tortoise and the Hare" involved in plaintiff's eleventh cause of action.

**5.** Subsequently Toby Tortoise, Max Hare and other cartoon characters were added in Count 11 (R. 466–467, 486; plaintiff's Br. 3). At least 21 characters are now involved (R. 486) including such well known favorites as Mickey and Minnie Mouse, Donald Duck, the Big Bad Wolf, the Three Little Pigs, and Goofy.

**6.** "Toby Tortoise and the Hare" was added later in Count 11 as a third infringing publication of defendants. According to defendant Turner, 15,000 to 20,000 copies were printed of each issue of the "Air Pirates" and 20,000 copies were printed of "The Tortoise and the Hare" (R. 490).

**7.** Section 3 provided:

"The copyright provided by this title shall protect all the copyrightable component parts of the work copyrighted, and all matter therein in which copyright is already subsisting, but without extending the duration or scope of such copyright. The copyright upon composite works or periodicals shall give to the proprietor thereof all the rights in respect thereto which he would have if each part were individually copyrighted under this title."

**8.** Article I, § 8, Cl. 8, empowers the Congress

"To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

Three years after granting the preliminary injunction, the district court granted summary judgment for plaintiff because the issues were "purely legal and ripe for decision" (R. 512). In its unreported summary judgment order, the court followed the rationale of its preliminary injunction opinion, adding that defendants' parody of Disney's copyrighted work without the consent of Disney "may not be achieved through outright copying of the original work" (R. 514). The court considered it immaterial that in some instances defendants used the challenged cartoon figures in different plots than Disney's or portrayed them with altered personalities, stating that "The test is whether the figures drawn by Defendants are substantial copies of the work of Plaintiff" (R. 515). The court concluded that defendants' challenged publications constituted trade[mark] infringements (concerning the Disney "Silly Symphony" trademark) and violated Disney's valid copyrights and that defendants were guilty of "unfair competition in the form of trade disparagement" (R. 515). In addition to granting Disney a permanent injunction, the court ordered defendants to deliver all infringing materials to Disney's counsel. Costs were awarded to Disney, and the amount of damages and reasonable attorney's fees to be paid to Disney was submitted to a magistrate for preliminary assessment. Only the question of defendants' liability is before us. We affirm as to copyright violation and reverse and remand as to the remainder.

## I.  Copyright Infringement

The issue that has attracted the most attention from the parties in this case is whether defendants' copies of the images of Disney's characters are infringements of Disney's copyright. In order to answer the subsidiary questions of whether Disney's characters are copyrightable and if so whether they were infringed, and whether defendants' infringement can be excused by the fair use defense or can be protected by the First Amendment, it is important to begin by noting what statute is controlling. In a post-argument letter, defendants claim that the Copyright Act of 1976, which took effect on January 1, 1978, must provide the controlling standards even though it became law after the entry of judgment below. See *Bradley v. School Board of the City of Richmond*, 416 U.S. 696, 711–721, 94 S.Ct. 2006, 40 L.Ed.2d 476. While this claim is based on a generally valid rule of law, that rule does not apply where there is a "statutory direction * * * to the contrary." *Id.* at 711, 94 S.Ct. 2006. The new Copyright Act expressly provides that all causes of action that arose under the Copyright Act before January 1, 1978, "shall be governed by title 17 as it existed when the cause of action arose." Public Law # 94–553, 90 Stat. 2600 (Transitional and Supplementary Provisions § 112), reproduced in 17 U.S.C. § 501 note. Therefore to the extent the legal issues in this case are controlled by statute, the old Copyright Act governs.

### A.  Copyrightability

In some instances Disney's copyrights cover a book and others an entire strip of several cartoon panels. The fact that its characters are not the separate subject of a copyright does not preclude their protection, however, because Section 3 of the then Copyright Act provided that Disney's copyrights included protection for "all the copyrightable component parts of the work copyrighted" (note 7 *supra* ).

The essence of defendants' argument is that characters are never copyrightable and therefore cannot in any way constitute a copyrightable component part. That argument flies in the face of a series of cases dating back to 1914 that have held comic strip characters protectable under the old Copyright Act. See *Detective Comics, Inc. v. Bruns Publications Inc.*, 111 F.2d 432 (2d Cir. 1940); *Fleischer Studios v. Freundlich*, 73 F.2d 276 (2d Cir. 1934), certiorari denied, 294 U.S. 717, 55 S.Ct. 516, 79 L.Ed. 1250; *King Features Syndicate v. Fleischer*, 299 F. 533 (2d Cir. 1924); *Detective Comics, Inc. v. Fox Publications Inc.*, 46 F.Supp. 872 (S.D.N.Y.1942); *Hill v. Whalen & Martell*,

Inc., 220 F. 359 (S.D.N.Y.1914); 1 *Nimmer on Copyright* § 30.[9]

It is true that this Court's opinion in *Warner Brothers Pictures v. Columbia Broadcasting System*, 216 F.2d 945 (9th Cir. 1954), certiorari denied, 348 U.S. 971, 75 S.Ct. 532, 99 L.Ed. 756, lends some support to the position that characters ordinarily are not copyrightable. There the mystery writer Dashiell Hammett and his publisher entered into a 1930 contract with Warner Brothers giving the movie production company copyright and various other rights to a "certain story * * * entitled Maltese Falcon" involving the fictional detective Sam Spade. In 1946, Hammett and other defendants used the Maltese Falcon characters in other writings, causing Warner Brothers to sue for copyright infringement and "unfair use and competition." After pointing out the sophisticated nature of the plaintiff, we construed the contracts between the parties and held:

"We are of the opinion that since the use of characters and character names are nowhere specifically mentioned in the agreements [including the assignment of copyright instrument], but that other items, including the title, 'The Maltese Falcon', and their use are specifically mentioned as being granted [to Warner Brothers], that the character rights with the names cannot be held to be within the grants, and that under the doctrine of *ejusdem generis*, general language cannot be held to include them." (Footnote omitted.)

After so holding, Judge Stephens' opinion considered "whether it was ever intended by the copyright statute that characters with their names should be under its protection." [10] In that context he concluded that such a restriction on Hammett's future use of a character was unreasonable, at least when the characters were merely vehicles for the story and did not "really constitute" the story being told. Judge Stephens' reasons for that conclusion provide an important indication of the applicability of that conclusion to comic book characters as opposed to literary characters. In reasoning that characters "are always limited and always fall into limited patterns," Judge Stephens recognized that it is difficult to delineate distinctively a literary character. Cf. *Nichols v. Universal Pictures Corp.*, 45 F.2d 119 (2d Cir. 1930), certiorari denied, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795. When the author can add a visual image, however, the difficulty is reduced. See generally 1 *Nimmer on Copyright* § 30. Put another way, while many literary characters may embody little more than an unprotected idea (see *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977)), a comic book character, which has physical as well as conceptual qualities, is more likely to contain some unique elements of expression. Because comic book characters therefore are distinguishable from literary characters, the *Warner Brothers* language does not preclude protection of Disney's characters.[11]

9. *National Comics Publications v. Fawcett Publications, Inc.*, 191 F.2d 594 (2d Cir. 1951), clarified 198 F.2d 927 (2d Cir. 1952), relied upon by defendants, deals more with copyright formalities than with copyrightability, and the copyrightability of a character was not in issue. To the extent that opinion discusses copyrightability, it indicates that copying details of comic strips constitutes infringement. 191 F.2d at 603. Contrary to defendants' contention, the opinion does not imply or indicate that protecting of characters would necessarily last for more than 56 years. See Section 3 of the then Copyright Act.

10. Judge Wollenberg's opinion viewed this language as an alternate holding rather than dicta, rekindling an old dispute about the status of the language. See 1 *Nimmer on Copyright* § 30 n. 587. For the reasons that follow, either characterization of the language would not affect the result in this case.

11. Because this conclusion is sufficient to justify protection of the characters, we need not endorse the district court's conclusion that Disney's characters fell within the *Warner Brothers* exception for characters who "really constitute" the story. The district judge did not state which Disney stories were the basis of the protection for any character, nor did it state which characters were so protected. Apart from failing to recognize that this exception seems to be limited to a "story devoid of plot" (1 *Nimmer on Copyright* § 30), the district court's conclusion may have been based on the

## B. *Infringement and Fair Use*

■ Defendants do not contend that their admitted copying was not substantial enough to constitute an infringement, and it is plain that copying a comic book character's graphic image constitutes copying to an extent sufficient to justify a finding of infringement. See 2 *Nimmer on Copyright* § 143.12; see generally *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977); *Henry Holt & Co. Inc. v. Liggett & Myers Tobacco Co.*, 23 F.Supp. 302 (E.D.Pa.1938). Defendants instead claim that this infringement should be excused through the application of the fair use defense, since it purportedly is a parody of Disney's cartoons.

At least since this Court's controversial ruling in *Benny v. Loew's Inc.*, 239 F.2d 532 (9th Cir. 1956), affirmed by an equally divided Court, 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583, the standards for applying the fair use defense in parody cases, like the standards for applying fair use in other contexts, have been a source of considerable attention and dispute. See 2 *Nimmer on Copyright* § 145. As a general matter, while some commentators have urged that the fair use defense depends only on whether the infringing work fills the demand for the original (see; e. g., Note, *Piracy or Parody: Never the Twain*, 38 U.Colo.L.Rev. 550 (1966); see generally 2 *Nimmer on Copyright* § 145), this Court and others have also consistently focused on the substantiality of the taking. See e. g., *Benny v. Loew's Inc.*, 239 F.2d 532 (9th Cir. 1956), affirmed by an equally divided Court, 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583; ⟩*Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303 (2d Cir. 1966) certiorari denied, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546; 17 U.S.C. § 107(3) (codifying old law). But cf. *Williams & Wilkins Co. v. United States*, 487 F.2d 1345, 203 Ct.Cl. 74 (1973), affirmed by an equally divided Court, 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264.

In inquiring into the substantiality of the taking, the district court read our *Benny* opinion to hold that any substantial copying by a defendant, combined with the fact that the portion copied constituted a substantial part of the defendant's work, automatically precluded the fair use defense. That such a strict reading of *Benny* was unjustified is indicated first by the fact that it would essentially make any fair use defense fruitless. If the substantiality of the taking necessary to satisfy the first half of that test is no different from the substantiality necessary to constitute an infringement, then the *Benny* test would be reduced to an absurdity, covering any infringement except those falling within the much-criticized and abandoned exception for cases in which the part copied was not a substantial part of the defendant's work. Compare *Rosemont Enterprises, Inc. v. Random House, Inc.*, 256 F.Supp. 55 (S.D.N.Y.1966), reversed on other grounds, 366 F.2d 303 (2d Cir. 1966), certiorari denied, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546; see 2 *Nimmer on Copyright* § 143.2.

■ The language in *Benny* concerning the substantiality of copying can be given a reading much more in keeping with the context of that case and the established principles at the time of that case if the opinion is understood as setting a threshold that eliminates from the fair use defense copying that is virtually complete or almost verbatim. Accord 2 *Nimmer on Copyright* § 145. It was an established principle at the time of *Benny* that such verbatim copying precluded resort to the fair use defense. See, e. g., *Leon v. Pacific Telephone & Telegraph Co.*, 91 F.2d 484 (9th Cir. 1937).[12] Moreover, the *Benny* facts presented a particularly appropriate instance to apply that settled principle. As the *Benny* district court found, Benny's "Autolight" tracked the parodied "Gas Light" in almost every

---

incorrect assumption that Disney's characters could be protected if together they constitute a whole story. Obviously the larger the group of characters that is selected, the easier it is to say that they "constitute" the entire story, par-

ticularly when only a general abstraction and not a particular story is analyzed.

**12.** In fact, *Leon* was cited favorably in *Benny*. 239 F.2d at 536.

respect: the locale and period, the setting, characters, story points, incidents, climax and much of the dialogue all were found to be identical. 131 F.Supp. 165, 171. In this context, *Benny* should not be read as taking the drastic step of virtually turning the test for fair use into the test for infringement. See *Columbia Pictures Corp. v. National Broadcasting Co.*, 137 F.Supp. 348 (S.D.Cal. 1955). To do otherwise would be to eliminate fair use as a defense except perhaps for those infringers who added an extra act at the end of their parody.

Thus *Benny* should stand only as a threshold test that eliminates near-verbatim copying. In the absence of near-verbatim copying, other courts have analyzed the substantiality of copying by a parodist by asking whether the parodist has appropriated a greater amount of the original work than is necessary to "recall or conjure up" the object of his satire. *Berlin v. E. C. Publications, Inc.*, 329 F.2d 541 (2d Cir. 1964), certiorari denied, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33; see *Columbia Pictures Corp. v. National Broadcasting Co.*, 137 F.Supp. 348 (S.D.Cal.1955).[13]

In order to facilitate application of either the *Benny* threshold test or the *Berlin* test, it is important to determine what are the relevant parts of each work that are compared in analyzing similarity. Plaintiff assumes in its brief that the graphic depiction, or pictorial illustration, is separately copyrightable as a component part, so that a verbatim copy of the depiction alone would satisfy the *Benny* test. Defendants proceed on the assumption that comparing their characters with plaintiff's involves a comparison not only of the physical image but also of the character's personality, pattern of speech, abilities, and other traits. Apparently this issue has not been addressed previously, and neither position is without merit. On the one hand, since an illustration in a book or catalogue can be copyrighted separately (see, *e. g.*, *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298 (9th Cir. 1965)), it might follow that an illustration in a comic strip is entitled to the same protection by virtue of Section 3 of the former Copyright Act (note 7 *supra*). On the other hand, to a different extent than in other illustrations, a cartoon character's image is intertwined with its personality and other traits, so that the "total concept and feel" (*Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir. 1970)) of even the component part cannot be limited to the image itself.[14]

■ We need not decide which of these views is correct, or whether this copying was so substantial to satisfy the *Benny* test, because it is our view that defendants took more than is allowed even under the *Berlin* test as applied to both the conceptual and physical aspects of the characters. In evaluating how much of a taking was necessary to recall or conjure up the original, it is first important to recognize that given the widespread public recognition of the major characters involved here, such as Mickey Mouse and Donald Duck (see *e. g.*, R. 191–193), in comparison with other characters very little would have been necessary to

---

**13.** In so construing *Benny*, we necessarily disagree with its dictum that a parody is treated no differently than any other taking. See *Berlin v. E. C. Publications, Inc.*, 329 F.2d 541 (2d Cir. 1964), certiorari denied, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33.

**14.** While not explicitly noting these competing arguments or focusing on whether an image is a protectable component part, most of the cases dealing with cartoon characters have considered the character's personality and other traits in addition to its image. See, *e. g.*, *Detective Comics, Inc. v. Bruns Publications, Inc.*, 111 F.2d 432 (2d Cir. 1940); *Warner Brothers Inc. v. Film Ventures International*, 403 F.Supp. 522, 525 (C.D.Cal.1975). See also *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157, 1169 (9th Cir. 1977); 1 *Nimmer on Copyright* § 30; Note, *The Protection Afforded Literary and Cartoon Characters Through Trademark, Unfair Competition and Copyright*, 68 Harv.L.Rev. 349 (1954). In what appears to be the only two cases that have viewed a character only as an image (*King Features Syndicate v. Fleischer*, 299 F. 533 (2d Cir. 1924); *Fleischer v. Freundlich*, 73 F.2d 276 (2d Cir. 1936)), the alleged copying was of a doll, which could have only an image and no conceptual character traits; therefore the issue of whether the comic character's depiction included a personality was not raised.

place Mickey Mouse and his image in the minds of the readers. Second, when the medium involved is a comic book, a recognizable caricature is not difficult to draw, so that an alternative that involves less copying is more likely to be available than if a speech, for instance, is parodied. Also significant is the fact that the essence of this parody did not focus on how the characters looked, but rather parodied their personalities, their wholesomeness and their innocence.[15] Thus arguably defendants' copying could have been justified as necessary more easily if they had paralleled closely (with a few significant twists) Disney characters and their actions in a manner that conjured up the particular elements of the innocence of the characters that were to be satirized. While greater license may be necessary under those circumstances, here the copying of the graphic image appears to have no other purpose than to track Disney's work as a whole as closely as possible.

■ Defendants' assertion that they copied no more than necessary appears to be based on an affidavit, which stated that "the humorous effect of parody is best achieved when at first glance the material appears convincingly to be the original, and upon closer examination is discovered to be quite something else" (Br. 20–21). The short answer to this assertion, which would also justify substantially verbatim copying, is that when persons are parodying a copyrighted work, the constraints of the existing precedent do not permit them to take as much of a component part as they need to make the "best parody." Instead, their desire to make the "best parody" is balanced against the rights of the copyright owner in his original expressions. That balance has been struck at giving the parodist what is necessary to conjure up the original, and in the absence of a special need for accuracy

(compare *Meeropol v. Nizer*, 560 F.2d 1061, 1071 (2d Cir. 1977), certiorari denied, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756), that standard was exceeded here. By copying the images in their entirety, defendants took more than was necessary to place firmly in the reader's mind the parodied work and those specific attributes that are to be satirized. See Netterville, *Parody, Mimicry and Humorous Commentary*, 35 So.Cal.L. Rev. 225, 238 (1962).

Because the amount of defendant's copying exceeded permissible levels, summary judgment was proper. See *Berlin v. E. C. Publications*, 329 F.2d 541 (2d Cir. 1964), certiorari denied, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33. While other factors in the fair use calculus may not be sufficient by themselves to preclude the fair use defense, this and other courts have accepted the traditional American rule that excessive copying precludes fair use. See, e. g., *Benny v. Loew's Inc.*, 239 F.2d 532 (9th Cir. 1956), affirmed by an equally divided Court, 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583; *Walt Disney Productions v. Mature Pictures Corp.*, 389 F.Supp. 1397 (S.D.N.Y.1975); see generally *Berlin v. E. C. Publications*, 329 F.2d 541 (2d Cir. 1964), certiorari denied, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33.[16]

## C. *First Amendment Considerations*

■ Defendants also insist that the First Amendment should bar any liability for their parody because otherwise protected criticism would be discouraged. There is of course some tension between the First Amendment and the Copyright Act, which was enacted pursuant to the Copyright Clause of the Constitution (note 8 *supra*), but defendants' claim can be dismissed without a lengthy discussion that it otherwise might merit in light of our recent

---

**15.** In making this distinction, we do not regard it as fatal, as some courts have done (see, e. g., *Walt Disney Productions v. Mature Pictures Corp.*, 389 F.Supp. 1397 (S.D.N.Y.1975)), that the "Air Pirates" were parodying life and society in addition to parodying the Disney characters. Such an effect is almost an inherent aspect of any parody. To the extent that the Disney characters are not also an object of the parody, however, the need to conjure them up would be reduced if not eliminated.

**16.** This exclusion of other factors is not a drastic step, since the level of permissible copying selected in *Benny* was set with a recognition of and as a compromise with other concerns such as the nature and character of the use.

decision in *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157, 1170 (9th Cir. 1977). In that case we endorsed not only Judge Wollenberg's dismissal of defendants' First Amendment claim here, but also the accommodation that "the idea-expression line represents an acceptable definitional balance as between copyright and free speech interests." Because the defendants here could have expressed their theme without copying Disney's protected expression, *Sid & Marty Krofft* requires that their First Amendment challenge be dismissed. See also *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 577 and n. 13, 97 S.Ct. 2849, 53 L.Ed.2d 965.

## II. *Trademark Infringement*

Given the novelty and importance of the copyright issues in this case, plaintiff's eighth cause of action, which charged that defendants infringed its trademark "Silly Symphony" in their publications where they referred to "Silly Sympathies," received little attention from the parties and the district court in the proceedings below. In its opinion on the preliminary injunction, the district court found it unnecessary to pass on this charge. 345 F.Supp. at 116. During the ensuing proceedings, in its Memorandum in Support of its Motion for Summary Judgment, Disney referred the district court to "a simple visual comparison of Disney's trademark with defendants' imitation."[17] Disney's comic books bear the title "Silly Symphony" and defendants used the title "Silly Sympathies" as the title of two of the cartoon stories in their books. In each instance, the respective parties arranged the title letters on a curving musical staff (Def.Br. 44). Besides reference to the comic books, apparently no other evidence suggesting a likelihood of confusion was offered.

On this record a grant of summary judgment for plaintiffs was improper. In discussing how district courts should attempt to determine likelihood of confusion, we previously have listed a wide range of factors that should be taken into account.

See *J. B. Williams Co., Inc. v. Le Conte Cosmetics, Inc.*, 523 F.2d 187, 191 (9th Cir. 1975), certiorari denied, 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317; *Carter-Wallace Inc. v. Procter & Gamble Co.*, 434 F.2d 794 (9th Cir. 1970). While a comparison of the mark and the imitation is one such factor, that comparison should not be a simple, visual, side-by-side comparison but rather the mark and the imitation should be viewed "in light of what occurs in the marketplace," (*James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976)), taking into account the "circumstances surrounding the purchase of the goods." *Procter & Gamble Co. v. Conway*, 419 F.2d 1332, 1335, 57 CCPA 865 (1970). By making a simple abstract comparison, the district court apparently did not consider that defendants' imitation appeared only in the middle of their comic books and that defendants' comic books were sold in adult, counter-culture stores. When put in that context and when it is therefore recognized that the imitation would be seen by an adult in a counter-culture store who in all probability before seeing the imitation would already have been struck by the incompatibility of defendants' work with Disney's, as well as defendants' proper attribution of source in the front of each book, the likelihood that the use of "Silly Sympathies" would be confusing is markedly diminished. See *Girl Scouts of the U.S. of A. v. Personality Posters Mfg. Co.*, 304 F.Supp. 1228 (S.D.N.Y.1969).

Notably, several of the other factors that we have directed district courts to consider also diminish the likelihood of confusion on the present state of the record. For example, there is no proof of actual confusion. Nor is there any indication of improper intent by defendants in their use of "Silly Sympathies." In view of the district court's apparent reliance on an abstract comparison of the marks and the fact that the factual issues that might be explored would be helpful in determining likelihood of confusion, its order granting summary judgment on the eighth cause of action is reversed and remanded for trial.

---

17. See Disney's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment (filed July 3, 1975) at R. 491, where the point was fully briefed (R. 490–495).

III. *Unfair Competition and Trade Disparagement*

A necessary starting point in adjudicating plaintiff's unfair competition and trade disparagement claims is a determination of what law applies. Jurisdiction was alleged under the pendent jurisdiction doctrine and under 28 U.S.C. § 1338(b), both of which are necessarily dependent on state law. See *e. g., Ramirez & Feraud Chili Co. v. Las Palmas Food Co.*, 146 F.Supp. 594 (S.D.Cal.1956), affirmed, 245 F.2d 874 (9th Cir. 1957), certiorari denied, 355 U.S. 927, 78 S.Ct. 384, 2 L.Ed.2d 357. Although no facts were alleged or developed in an effort to select which state's law applies, the record does reveal that plaintiff is a California corporation, that defendants are California residents who did business in California, and that defendants' distributor was located in California. In light of those facts and in light of the rule articulated in *Sinatra v. Goodyear Tire & Rubber Co.*, 435 F.2d 711, 714 (9th Cir. 1970), certiorari denied, 402 U.S. 906, 91 S.Ct. 1376, 28 L.Ed.2d 646,[18] that "in the absence of any other showing" the law of the forum state must be applied, we hold that California law applies and therefore look to it to determine the standards governing plaintiff's cause of action.

Our research into California law reveals a consistently enforced requirement that a plaintiff charging unfair competition prove a likelihood of confusion by purchasers as to source. See *Sinatra, supra; Ball v. American Trial Lawyers Ass'n*, 14 Cal. App.3d 289, 92 Cal.Rptr. 228 (1971); *Payne v. United California Bank*, 23 Cal.App.3d 850, 100 Cal.Rptr. 672 (1972); *Plotkin v. Tanner's Vacuums*, 53 Cal.App.3d 454, 125 Cal.Rptr. 697, 700 (1975). While that requirement can be avoided in claims under the state's anti-dilution statute,[19] that stat-

ute apparently applies only to marks and trade names and in any event provides only for injunctive relief. Other common law claims might have been conceivable on these facts, but they too have requirements not pleaded or proved by plaintiffs. See 4 B. Witkin, *Summary of California Law* § 330 (8th ed. 1974) (trade libel). Given plaintiff's failure to offer any evidence indicating a likelihood of confusion (compare *Berlin v. E. C. Publications, Inc.*, 329 F.2d 541, 543 (2d Cir. 1974), certiorari denied, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33) and to allege or prove sufficient facts for an alternate theory, summary judgment for plaintiffs was improper. On remand the district judge should direct the parties to offer proof relevant to any state theories of monetary and equitable recovery that he determines were properly pleaded.

Judgment affirmed as to copyright infringement and reversed and remanded as to trademark infringement, unfair competition and trade disparagement.

---

**18.** In *Sinatra* Goodyear used in one of its commercials an admitted imitation of a Nancy Sinatra song. Even though the defendants were incorporated outside California and the commercial was distributed nationwide, California law was held applicable.

**19.** That statute provides:
"*Business and Professions Code*
 § 14330. Injunctive relief

Likelihood of injury to business reputation or of dilution of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."