**Carol BURNETT, an individual; Whacko, Inc., a California corporation, Plaintiff,**

v.

**TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware corporation, Defendants.**

**No. CV 07–01723 DDP.**

United States District Court, C.D. California.

June 4, 2007.

Gary L. Bostwick and Jean–Paul Jassy of Bostwick & Jassy LLP in Los Angeles, CA, for Twentieth Century Fox Film Corporation.

Marvin G. Burns and also Robert Denton of Lurie, Zepeda, Schmalz and Hogan in Beverly Hills, CA, for the plaintiffs.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

PREGERSON, District Judge.

This matter comes before the Court on Twentieth Century Fox Film Corporation's ("Fox") motions to dismiss for failure to state a claim and special motion to strike pursuant to California's Anti–SLAPP statute. After reviewing the papers submitted by the parties, the Court grants the motion to dismiss, deny the special motion to strike as moot, and adopts the following order.

### I. B'ACKGROUND

Family Guy is a half-hour, animated, comedy television program broadcast on primetime and geared toward an adult audience. Compl. ¶ 10. The show borrows heavily from popular culture, following the exploits of the Griffin family and friends in the fictional suburb of Quahog, Rhode Island. *Id.* ¶ 9. Family Guy routinely puts

cartoon versions of celebrities in awkward, ridiculous, and absurd situations in order to lampoon and parody those public figures and to poke fun at society's general fascination with celebrity and pop culture. *See, e.g.*, Ex. A.

On or about April 23, 2006, Fox aired an episode of "Family Guy" entitled "Peterotica." *Id.*, ¶ 10. Near the beginning of the episode, the Griffin family patriarch, Peter Griffin, an "Archie Bunker"-like character, enters a porn shop with his friends. *Id.* ¶¶ 9, 10. Upon entering, Peter remarks that the porn shop is cleaner than he expected. *Id.*, ¶ 10; Ex. A. One of Peter's friends explains that "Carol Burnett works part time as a janitor." *Id.* The screen then switches for less than five seconds to an animated figure resembling the "Charwoman" from the Carol Burnett Show, mopping the floor next to seven "blow-up dolls," a rack of "XXX" movies, and a curtained room with a sign above it reading "Video Booths." *Id.* As the "Charwoman" mops, a "slightly altered version of Carol's Theme from The Carol Burnett Show is playing." *Id.* ¶ 10. The scene switches back to Peter and his friends. *Id.* One of the friends remarks: "You know, when she tugged her ear at the end of that show, she was really saying goodnight to her mom." *Id.*; Ex. A. Another friend responds, "I wonder what she tugged to say goodnight to her dad," finishing with a comic's explanation, "Oh!" *Id.*

In response to this Family Guy clip, plaintiffs Carol Burnett and Whacko, Inc., filed this suit against defendant Fox for: (1) copyright infringement; (2) violation of the Lanham Act, 15 U.S.C. § 1125; (3) violation of California's statutory right of publicity, Civil Code § 3344; and (4) common law misappropriation of name and likeness. Defendant now moves to dismiss plaintiffs' claims. Defendant also brings a special motion to strike Burnett's supple-

mental state law (claims) under California's anti-SLAPP statute, California Code of Civil Procedure § 425.16.

## II. LEGAL STANDARD

Dismissal under Rule 12(b)(6) is appropriate when it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations set forth in the complaint. *Newman v. Universal Pictures,* 813 F.2d 1519, 1521–22 (9th Cir.1987). The court must view all allegations in the complaint in the light most favorable to the non-movant and must accept all material allegations—as well as any reasonable inferences to be drawn from them—as true. *North Star Int'l v. Arizona Corp. Comm'n,* 720 F.2d 578, 581 (9th Cir.1983).

The scope of review on a motion to dismiss for failure to state a claim is generally limited to the content of the complaint. *Pegasus Holdings v. Veterinary Centers of America,* Inc., 38 F.Supp.2d 1158, 1159–60 (C.D.Cal.1998). The Court may, however, consider exhibits submitted or referenced in the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. *Id.* Indeed, "documents specifically referred to in a complaint, though not physically attached to the pleading, may be considered where authenticity is unquestioned." *Daly v. Viacom, Inc.,* 238 F.Supp.2d 1118, 1121–22 (N.D.Cal.2002) (considering television program referenced in, but not attached to, complaint).

Leave to amend should not be granted where the complaint is futile. *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 991 (9th Cir.1999).

Federal district courts may exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or contro-

versy ...." 28 U.S.C. § 1367(a). Courts "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction ...." 28 U.S.C. § 1367(c)(3). *See also Ove,* 264 F.3d at 822 (upholding district court's refusal to exercise supplemental jurisdiction over state claims after dismissing federal claims, including dismissal of § 1983 claim for failure to state a claim).

## III. DISCUSSION

### A. *Plaintiffs' First Claim for Relief*

■ Plaintiffs' first claim of relief alleges that Fox infringed plaintiffs' copyrighted material. Defendant contends that even assuming *arguendo* that plaintiffs possess valid copyrights, plaintiffs' first claim of relief is barred as a matter of law by the doctrine of fair use.

■ The Copyright Act of 1976 protects the fair use of another's copyrighted work:

...[T]he fair use of a copyrighted work ... for purposes such as criticism [and] comment ... is not an infringement of copyright. In determining whether the use of a made work in any particular case is a fair use the factors to be considered shall include:*

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use on the potential market for or value of the copyrighted work. . . .

17 U.S.C. § 107. The fair use doctrine calls for a "case-by-case analysis." *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S.

569, 577, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). "The text [of 17 U.S.C. § 107] employs the terms 'including' and 'such as' in the preamble paragraph to indicate the 'illustrative and not limitative' function of the examples given." *Id.* Courts must consider and weigh all four factors. *Id.* The Court may conduct a fair use analysis, as a matter of law, where the facts are presumed or admitted. *See Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *see also Fisher v. Dees,* 794 F.2d 432, 435–36 (9th Cir.1986)(finding fair use where the material facts were not at issue or were admitted; judgments pertaining to fair use "are legal in nature" and are to be made by the court).

### 1. *The Purpose and Character of the Use*

■ The first factor, the "purpose and character of the use," addresses "whether the new work merely 'supercedes the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message, in other words, whether and to what extent the new work is 'transformative.'" *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164 (internal citations omitted).

■ Among the various forms of "transformative use" is that of parody. *See id.* A parody is a " 'literary or artistic work that imitates the characteristic style of an author or a work for comic effort or ridicule,' or as a 'composition in prose or verse in which the characteristic turns of thought and phrase or class of authors are imitated in such a way as to make them appear ridiculous.'" *Id.* at 580, 114 S.Ct. 1164. "[P]arody has an obvious claim to transformative value" because "[l]ike less ostensibly humorous forms of criticism, it can provide social benefit, by shedding

light on an earlier work, and, in the process, creating a new one." *Id.* at 579, 114 S.Ct. 1164. "For purposes of copyright law, the nub of the definitions, and the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author' composition to create a new one, that, at least in part, comments on that author's works." *Id.* at 580, 114 S.Ct. 1164.

In *Campbell,* the Supreme Court found that hip-hop band 2–Live Crew's rendition of "Pretty Woman" was a parody because it targeted the original song and commented "on the naivete of the original of an earlier day, as a rejection of its sentiment that ignores the ugliness of street life and the debasement that it signifies." *Id.* at 583, 114 S.Ct. 1164. Relying on *Campbell* in *Mattel, Inc. v. Walking Mountain Productions,* 353 F.3d 792, 802 (9th Cir.2003), the Ninth Circuit remarked: "No doubt, 2–Live Crew could have chosen another song to make such a statement. Parody only requires that 'the plaintiff's copyrighted work is *at least in part the target* of the defendant's satire,' not that the plaintiff's work be the irreplaceable object for its form of social commentary." *Id.* (internal citations omitted) (emphasis added).

In their opposition to the motion to dismiss, plaintiffs argue that Family Guy's use of the Charwoman in the Peterotica episode "does not constitute parody in the strict legal sense" and thus cannot be considered "transformative." (Pls. Opp. at 7). In support of this argument, plaintiffs assert that the target of the Family Guy parody was not the Charwoman character as such, but Carol Burnett herself. In fact, the Family Guy characters explain that the porn shop is clean because "Carol Burnett works part-time as a janitor" and make reference to Carol Burnett's signature ear tug. Plaintiffs point out that the

Charwoman never tugged her ear in The Carol Burnett Show; rather, Carol Burnett playing *herself* tugged at her ear in the closing segment of the show as a salute to her grandmother. Furthermore, plaintiffs assert that the act of placing the Charwoman in the role of a janitor in an erotic store is neither "absurd" nor "transformative" because "one could easily imagine a charwoman cleaning the floor of a porn shop." (Pls. Opp at 8).

Secondarily, plaintiffs argue that a comparison of the Family Guy's Charwoman and Burnett's Charwoman demonstrates that the Family Guy version is virtually a literal copy of Burnett's, *see* Denton Decl. ¶ 2; Exh. A, which is another indication that the use of the Charwoman is not "sufficiently transformative." (Pls. Opp. at 8). In sum, the crux of plaintiffs' argument is that the target of the "Family Guy's crude joke" appears to be Burnett, her family, and her wholesome image as opposed to the Charwoman. (Pls. Opp. at 7).

However, as the Supreme Court has pointed out, the correct inquiry is not whether the use of the material constitutes parody in a "strict legal sense." Rather, the "threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived" and "[w]hether ... parody is in good taste or bad taste does not and should not matter to fair use." *See Campbell,* 510 U.S. at 582, 114 S.Ct. 1164. As defendant correctly notes, it is immaterial whether the target of Family Guy's "crude joke" was Burnett, the Carol Burnett Show, the Charwoman, Carol's Theme Music or all four. The eighteen-second clip of the animated figure resembling the "Charwoman," mopping the floor next to "blowup dolls," a rack of "XXX" movies, and "video booths" in a porn shop is clearly designed to "imitate[ ] the characteristic

style of an author or a work for comic effort or ridicule," and is executed in such a manner that "the characteristic turns of thought and phrase or class of authors are imitated in such a way as to make them appear ridiculous." *Campbell*, 510 U.S. at 580, 114 S.Ct. 1164; *see also Lucasfilm Ltd. v. Media Market Group, Ltd.*, 182 F.Supp.2d 897, 901 (N.D.Cal.2002)(denying injunctive relief to block pornographic version of "Star Wars" because a "parodic character may reasonably be perceived"). Criticism of figures as universally recognized as Carol Burnett "will not always be reasoned or moderate," and may come in the form of " 'vehement, caustic, and sometimes unpleasantly sharp attacks.' " *Hustler Magazine v. Falwell*, 485 U.S. 46, 51, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). Here, Family Guy put a cartoon version of Carol Burnett/the Charwoman in an awkward, ridiculous, crude, and absurd situation in order to lampoon and parody her as a public figure. Therefore, the Court finds that a parodic character may reasonably be perceived in the Family Guy's use of the Charwoman because it is a "literary or artistic work that broadly mimics an author's characteristic style and holds it up to ridicule." *See Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1401 (9th Cir.1997) (quoting American Heritage Dictionary definition of parody). The episode at issue put a cartoon version of Carol Burnett/the Charwoman in an awkward, ridiculous, crude, and absurd situation in order to lampoon and parody her as a public figure. Accordingly, the Court finds this factor weighs in favor of fair use.

### 2. *The Nature of the Copyrighted Work*

■ The second § 107 factor is "the nature of the copyrighted work." This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the

consequence that fair use is more difficult to establish when the former works are copied. *See Stewart v. Abend*, 495 U.S. 207, 237–238, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990) (contrasting fictional short story with factual works); *Harper & Row*, 471 U.S. at 563–564, 105 S.Ct. 2218 (contrasting soon-to-be-published memoir with published speech); *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 455, n. 40, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (contrasting motion pictures with news broadcasts); *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 348–351, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (contrasting creative works with bare factual compilations); 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 13.05[A][2] (1993) (hereinafter Nimmer) However, as the Supreme Court announced in *Campbell*, and both plaintiffs and defendant recognize in their briefs, the second factor "is not much help in resolving ... parody cases, since parodies almost invariably copy publicly known, expressive works...." *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164. Accordingly, the Court does not accord great weight here to the second factor in the fair use analysis.

### 3. *The Amount and Substantiality of the Amount Used*

■ The third factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," § 107(3) ... are reasonable in relation to the purpose of the copying. *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164. Here, attention turns to "the persuasiveness of a parodist's justification for the particular copying done, and the enquiry will harken back to the first of the statutory factors, for, as in prior cases, [the Supreme Court] recognize[d] that the extent of permissible copying varies with the purpose and character of the use.... The

facts bearing on this factor will also tend to address the fourth, by revealing the degree to which the parody may serve as a market substitute for the original or potentially licensed derivatives." *Id.*

In explaining the application of the third factor, the Court in *Campbell,* stated that "[w]hen parody takes aim at a particular original work, the parody must be able to 'conjure up' at least enough of that original to make the object of its critical wit recognizable.... What makes for this recognition is quotation of the original's most distinctive or memorable features, which the parodist can be sure the audience will know. Once enough has been taken to assure identification, how much more is reasonable will depend, say, on the extent to which the song's overriding purpose and character is to parody the original or, in contrast, the likelihood that the parody may serve as a market substitute for the original. But using some characteristic features cannot be avoided." *Campbell,* 510 U.S. at 588, 114 S.Ct. 1164. In relation to its discussion of the third factor, the Court relied on *Fisher v. Dees,* 794 F.2d at 438–39 (9th Cir.1986) and *Elsmere Music, Inc. v. NBC,* 623 F.2d 252, 253 (2d Cir.1980).

In *Elsmere,* cast members of the comedy television program "Saturday Night Live" sang an eighteen-second parody of "I Love New York" using the words "I Love Sodom" repeated three times, and the court found fair use, noting the brief use of the material and that "the repetition of the copied material served both to ensure viewer recognition and to satirize the frequent broadcasting of the original." *Elsmere,* 623 F.2d at 253. In *Fisher,* the Ninth Circuit concluded that a twenty nine-second song parody on a forty-minute comedy album, which copied the first bars of an underlying song with parodic alterations to the opening lyrics, took "no more

from the original than necessary to accomplish reasonably its parodic purpose." *Fisher,* 794 F.2d at 439.

Here, plaintiffs argue that Fox took more of the Charwoman character's image and Carol's theme music than was necessary to place that image in the minds of viewers. Plaintiffs stress that the Family Guy Charwoman is a "near verbatim copy of Burnett's Charwoman" and analogize the present case to *Walt Disney Productions v. Air Pirates,* 581 F.2d 751 (9th Cir.1978), wherein the panel concluded that it was not necessary, and hence not fair use, for adult comic book authors to copy Disney characters in their entirety to place the characters in the minds of their readers. *Id.* at 757–58.

This argument is unpersuasive. The Charwoman, the Carol Burnett Show theme music, and the jokes told about Burnett's family appear on screen for approximately eighteen seconds. As in *Elsmere, Fisher,* and *Campbell,* Family Guy took "no more from the original than necessary to accomplish reasonably its parodic purpose." *Fisher,* 794 F.2d at 439. Although Family Guy could have used more than just a "fleeting evocation," *see Fisher,* 794 F.2d at 439, and an "[e]ven more extensive use would still have been fair use," *Elsmere,* 623 F.2d at 253, n. 1, Family Guy "conjures up" the "Charwoman" and "Carol's theme" for less than five seconds. *Compare* Ex. A with *Fisher,* 794 F.2d at 439 (29–second song parody) and *Elsmere,* 623 F.2d at 253 (18–second song parody). As the defendant correctly notes, there is no requirement that "parodists take the *bare minimum* amount of copyright material necessary to conjure up the original work." *Suntrust Bank,* 268 F.3d 1257, 1273 (11th Cir.2001)(emphasis added). Here, Family Guy takes just enough of the imagery and accompanying theme music to make this crude·depiction of the Charwom-

an character "recognizable" to viewers. Accordingly, the third factor weighs in favor of fair use.

### 4. *The Effect of the Use on the Potential Market*

The fourth fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor requires the Court to consider "the extent of market harm caused by the particular actions of the alleged infringer," as well as " 'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590, 114 S.Ct. 1164. This factor requires the court to weigh "the benefit the public will derive if the use is permitted [against] the personal gain the copyright owner will receive if the use is denied." *Dr. Seuss Enterprises*, 109 F.3d at 1403.

In *Fisher*, the Ninth Circuit admonished that "[i]n assessing the economic effect of the parody, the parody's critical impact must be excluded. Through its critical function, a 'parody may quite legitimately aim at garroting the original, destroying it commercially as well as artistically.' Copyright law is not designed to stifle critics." *Fisher*, 794 F.2d at 436. The Ninth Circuit clarified the inquiry in parody cases as being "not its potential to destroy or diminish the market for the original..." but rather its potential to fulfill "the demand for the original." *Id.* The panel held that "infringement occurs when a parody supplants the original in markets the original is aimed at, or in which the original is, or has reasonable potential to become, commercially valuable." *Id.*

In *Fisher*, the Ninth Circuit found that the danger of commercial substitution was unlikely where defendants created a twen-ty nine-second recording concerning a woman who sniffs glue, which parodied the famous jazz standard "When Sunny Gets Blue," a lyrical song concerning a woman's feelings about lost love. In holding that the parody had no cognizable economic effect on the original, the Court stated it was unconvinced that "consumers desirous of hearing a romantic and nostalgic ballad such as the composers' song would be satisfied to purchase the parody instead." Furthermore, "those fond of parody" were not "likely to consider 'When Sunny Gets Blue' a source of satisfaction." *Id.*

Here, as in *Fisher*, the Court finds that commercial substitution is not likely in this case. Defendant is correct that the market demand for a non-parodic use of the Charwoman would not be fulfilled by a use that has the character in front of "blow-up" dolls and "XXX movies." Arguing that the fourth factors weighs against fair use, plaintiffs raise the issue that the Family Guy's use of the Charwoman inflicts harm on the good will and reputation associated with the copyrighted work. However, a "parody may quite legitimately aim at garroting the original, destroying it commercially as well as artistically." *Id.* Indeed, " '[d]estructive' parodies play an important role in social and literary criticism and thus merit protection even though they may discourage or discredit an original author." *Id.*

Accordingly, the Court finds that the four factors of § 107 weigh strongly in favor of a finding of fair use and that plaintiffs' first claim of relief for copyright infringement should be dismissed without leave to amend. Ordinarily, "[d]ismissal without leave to amend is improper unless it is clear that the complaint could not be saved by any amendment." *Polich v. Burlington Northern, Inc.*, 942 F.2d 1467, 1472 (9th Cir.1991). However, leave to amend should not be granted when plaintiffs could

not allege any additional facts which might cure defects in the complaint. *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir.1993) (denying leave to amend when plaintiffs failed to allege additional facts which might cure defects in complaint). Here, it is clear that the complaint can not be saved by any amendment. *See Polich*, 942 F.2d at 1472; *see also In re Silicon Graphics*, 183 F.3d at 991 (9th Cir.1999) (leave to amend should not be granted where the complaint is futile). Accordingly, the Court grants defendant's motion to dismiss plaintiffs' first claim for relief without leave to amend.

### B. *Plaintiffs' Second Claim for Relief*

▮ Plaintiffs' second claim for relief for violation of the Lanham Act, 15 U.S.C. § 1125, alleges that defendant's use of the Charwoman is "likely to cause confusion, or to cause mistake, or to deceive the public as to the affiliation, connection, or association of Ms. Burnett with Fox or the 'Family Guy' program, or is likely to cause confusion as to the origin, sponsorship, or approval of the 'Family Guy' program, and such use by Fox has caused dilution of the distinctive quality of the 'Charwoman' mark". Compl., ¶ 20. Defendant urges the Court to dismiss this claim on several grounds. The Court grants defendant's motion to dismiss plaintiffs' second claim for relief both because it finds no likelihood that viewers would be confused by defendant's use of the Charwoman character and because defendant's parodic work is considered noncommercial speech and, therefore, not subject to any trademark dilution claim.

### I. *Likelihood of Confusion*

▮ A trademark claim exists under the Lanham Act " 'where the public interest in avoiding consumer confusions outweighs the public interest in free ex-

pression.' " *Mattel*, 353 F.3d at 807 (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir.1989)) Some parodies will constitute an infringement, some will not. "But the cry of 'parody!' does not magically fend off otherwise legitimate claims of trademark infringement or dilution. There are confusing parodies and non-confusing parodies. All they have in common is an attempt at humor through the use of someone else's trademark." 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31:153 (2007). A non-infringing parody is merely amusing, not confusing. *Dr. Seuss Enterprises*, 109 F.3d at 1394.

▮ "Where a defendant uses a variation on plaintiff's mark merely to make a clever turn of a phrase, resolution of the likely confusion issue may be quite different. If the difference in wording or appearance of the designation together with the context and overall setting is such as to convey to the ordinary viewer that this is a joke, not the real thing, then confusion as to source, sponsorship, affiliation or connection is unlikely." *See* McCarthy at § 31:153. Furthermore, the more distasteful and bizarre the parody, the less likely the public is to mistakenly think that the trademark owner has sponsored or approved it:

> Indeed, the more outrageous and offensive the parody, the less likely confusion will result. .... [T]rademark owners, like public figures, who seek the public spotlight must accept the concomitant risk of public ridicule in the form of parody.

M.K. Cantwell, *Confusion, Dilution and Speech: First Amendment Limitations on the Trademark Estate: An Update*, 94 Trademark Rptr. 547, 582–583 (2004); *see Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 223 U.S.P.Q. 1000 (2d Cir.1984) (holding no likely confusion be-

tween defendant's "comical, farcical, child-like and nonsexual" DONKEY KONG video game character and plaintiff's famous movie character KING KONG, who was "a ferocious gorilla in quest of a beautiful woman"; court observed that "the fact that DONKEY KONG so obviously parodies the KING KONG theme strongly contributes to dispelling confusion on the part of consumers"); *Universal City Studios v. Casey & Casey*, 622 F.Supp. 201, 228 U.S.P.Q. 195 (S.D.Fla.1985), aff'd without op., 792 F.2d 1125 (11th Cir.1986) (no preliminary injunction against merchandise showing two cartoon mice characters identified as MIAMI MICE, as not likely to cause confusion with television series MIAMI VICE); *Universal City Studios v. T-Shirt Gallery*, 634 F.Supp. 1468, 230 U.S.P.Q. 23 (S.D.N.Y.1986) (strength of the parody "highlights the differences" and "should dispel any confusion"); See *Lucasfilm Ltd. v. Media Market Group, Ltd.*, 182 F.Supp.2d 897, 179 A.L.R. Fed. 659 (N.D.Cal.2002) (animated pornographic movie entitled STARBALLZ found to be a parody of STAR WARS movies and not in violation of the federal anti-dilution laws. "Parody is a form of non-commercial, protected speech which is not affected by the Federal Trademark Dilution Act."); *Mattel*, 353 F.3d 792 (9th Cir.2003), on remand to, 2004 Copr. L. Dec. P 28824, 2004 WL 1454100 (C.D.Cal.2004) (Artistic photographs parodying BARBIE doll in incongruous situations are neither dilution nor trademark infringement of the word mark BARBIE or the doll trade dress. "Any reasonable consumer would realize the critical nature of this [accused] work and its lack of affiliation with Mattel. Critical works are much less likely to have a perceived affiliation with the original work.").

The Court finds that defendant's use of the Charwoman character in this case creates no likelihood of confusion. Family Guy is a cartoon comedy show known for its lampooning of celebrities and pop culture. The eighteen second clip featuring the Charwoman can be fairly classified as distasteful and bizarre, even outrageous and offensive. However, the nature of the use does not explicitly mislead the viewer as to affiliation, connection, association with, or sponsorship or approval by plaintiffs. As the Ninth Circuit stated in *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 903 (9th Cir.2002):

> "If we see a painting titled 'Campbell's Chicken Noodle Soup,' we're unlikely to believe that Campbell's has branched into the art business. Nor, upon hearing Janis Joplin croon 'Oh Lord, won't you buy me a Mercedes–Benz?,' would we suspect that she and the carmaker had entered into a joint venture.... [M]ost consumers are well aware that they cannot judge a book solely by its title any more than by its cover."

*MCA*, 296 F.3d at 900. Likewise, in this case, no reasonable viewer would mistake the Charwoman or Carol Burnett as anything other than the target of a Family Guy parody. Accordingly, the Court grants defendant's motion to dismiss the second claim for relief with respect to the likelihood of confusion claim.

ii. *Trademark Dilution*

Plaintiffs' second claim for relief also alleges that Fox's use of the Charwoman character "has caused dilution of the distinctive quality of the 'Charwoman' mark." Compl., ¶ 20.

 Dilution may occur where use of a trademark "whittle[s] away ... the value of a trademark" by "blurring their uniqueness and singularity" or by "tarnishing them with negative associations." *MCA*, 296 F.3d at 903 (internal citations omitted). However, "[t]arnishment caused merely by an editorial or artistic parody which satirizes plaintiff's product or its

image is not actionable under an anti-dilution statute because of the free speech protections of the First Amendment...." 4 McCarthy, *supra,* § 24:105, at 24–225. A dilution action only applies to purely commercial speech. *MCA,* 296 F.3d at 904. Parody is a form of noncommercial expression if it does more than propose a commercial transaction. *See id.* at 906. Under *MCA,* Fox's artistic and parodic work is considered noncommercial speech and, therefore, not subject to a trademark dilution claim.

Accordingly, the Court grants defendant's motion to dismiss without leave to amend as to plaintiffs' second claim for relief under the Lanham Act.

### C. *Plaintiffs' State Law Claims for Relief*

Plaintiffs' also bring a third claim for relief alleging violation of California's statutory right of publicity, Civil Code § 3344 and a fourth claim for relief for common law misappropriation of name and likeness.

In addition to their motion to dismiss for failure to state a claim upon which relief can be granted, defendant has also filed a special motion to strike plaintiffs' state law claims for relief under California's anti-SLAPP statute, Code of Civil Procedure § 425.16.

As discussed above, the Court dismisses plaintiffs' first and second claims for relief without leave to amend. Without these federal claims, there is no federal subject matter jurisdiction. Federal district courts may exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy ...." 28 U.S.C. § 1367(a). Courts "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction ...." 28 U.S.C. § 1367(c)(3). *See also Ove,* 264 F.3d at 822 (upholding district court's refusal to exercise supplemental jurisdiction over state claims after dismissing federal claims, including dismissal of § 1983 claim for failure to state a claim). Accordingly, this Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. 1367(c)(3) over the two remaining state law claims. They are, therefore, dismissed and defendant's special motion to strike is denied as moot.

### III. CONCLUSION

Carol Burnett is an icon in American culture as is her character the "Charwoman." The Court has no doubt that she is, and rightly so, well known, respected, and beloved by a large segment of the American public based upon her persona and her outstandingly successful entertainment career. The Court fully appreciates how distasteful and offensive the segment is to Ms. Burnett. Debasing the "Charwoman" and also making Ms. Burnett's parents participants in a crude joke is understandably disheartening to Ms. Burnett, her family, and many fans. To some extent this dispute is indicative of just how far the "new media" has come from the "old media." The old media harkens back to days when crude jokes and insensitive, often mean spirited, programming was perhaps found in live night club performances but was not present on television. In the new media, any self imposed restraint essentially has been eliminated. Public figures, such as Ms. Burnett, are frequent targets of parodies and crude innuendo. As Ms. Burnett well knows, it takes far more creative talent to create a character such as the "Charwoman" than to use such characters in a crude parody. Perhaps Ms. Burnett can take some solace in that fact.

However, the law, as it must in an open society, provides broad protection for the defendant's segment. Therefore, the Court grants defendant's motion to dismiss plaintiff's complaint without leave to amend. The Court further denies defendant's special motion to strike as moot.

IT IS SO ORDERED.