MATTEL, INC., a Delaware corporation, Plaintiff–counter–defendant–Appellant,

v.

MCA RECORDS, INC., a California corporation, Defendant–counter–claimant–Appellee,

and

Universal Music International Ltd., a British company; Universal Music A/S, a Danish business entity; MCA Music Scandinavia AB, a Swedish business entity; Universal Music & Video Distribution, Inc., a New York corporation; DOES 1 through 20, Defendants–Appellees.

Mattel, Inc., a Delaware corporation, Plaintiff–counter–defendant–Appellee,

v.

Universal Music International Ltd., a British company; Universal Music A/S, a Danish business entity; MCA Music Scandinavia AB, a Swedish business entity; Universal Music & Video Distribution, Inc., a New York corporation; DOES 1 through 20, Defendants–Appellants,

and

MCA Records, Inc., a California corporation, Defendant–counter–claimant–Appellant.

Nos. 98–56453, 98–56577.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 5, 2000.

Filed July 24, 2002.

896

Adrian Mary Pruetz, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA, argued for the plaintiff-appellant.

Russell J. Frackman, George M. Borkowski, Jeffrey D. Goldman, Brent Rabowsky, Mitchell Silberberg & Knupp LLP, Los Angeles, CA, argued for the defendants-appellees.

Before D.W. NELSON, BRUNETTI and KOZINSKI, Circuit Judges.

## OPINION

KOZINSKI, Circuit Judge:

If this were a sci-fi melodrama, it might be called Speech–Zilla meets Trademark Kong.

### I

Barbie was born in Germany in the 1950s as an adult collector's item. Over the years, Mattel transformed her from a doll that resembled a "German street walker,"[1] as she originally appeared, into a glamorous, long-legged blonde. Barbie has been labeled both the ideal American woman and a bimbo. She has survived attacks both psychic (from feminists critical of her fictitious figure) and physical (more than 500 professional makeovers). She remains a symbol of American girlhood, a public figure who graces the aisles of toy stores throughout the country and beyond. With Barbie, Mattel created not just a toy but a cultural icon.

---

1. M.G. Lord, *Forever Barbie: The Unauthorized Biography of a Real Doll* 32 (1994).

With fame often comes unwanted attention. Aqua is a Danish band that has, as yet, only dreamed of attaining Barbie-like status. In 1997, Aqua produced the song Barbie Girl on the album *Aquarium*. In the song, one bandmember impersonates Barbie, singing in a high-pitched, doll-like voice; another bandmember, calling himself Ken, entices Barbie to "go party." (The lyrics are in the Appendix.) Barbie Girl singles sold well and, to Mattel's dismay, the song made it onto Top 40 music charts.

Mattel brought this lawsuit against the music companies who produced, marketed and sold Barbie Girl: MCA Records, Inc., Universal Music International Ltd., Universal Music A/S, Universal Music & Video Distribution, Inc. and MCA Music Scandinavia AB (collectively, "MCA"). MCA in turn challenged the district court's jurisdiction under the Lanham Act and its personal jurisdiction over the foreign defendants, Universal Music International Ltd., Universal Music A/S and MCA Music Scandinavia AB (hereinafter "foreign defendants"); MCA also brought a defamation claim against Mattel for statements Mattel made about MCA while this lawsuit was pending. The district court concluded it had jurisdiction over the foreign defendants and under the Lanham Act, and granted MCA's motion for summary judgment on Mattel's federal and state-law claims for trademark infringement and dilution. The district court also granted Mattel's motion for summary judgment on MCA's defamation claim.

Mattel appeals the district court's ruling that Barbie Girl is a parody of Barbie and a nominative fair use; that MCA's use of the term Barbie is not likely to confuse consumers as to Mattel's affiliation with Barbie Girl or dilute the Barbie mark; and that Mattel cannot assert an unfair competition claim under the Paris Convention for the Protection of Industrial Property. MCA cross-appeals the grant of summary judgment on its defamation claim as well as the district court's jurisdictional holdings.

## II

**A.** All three foreign defendants are affiliated members of Universal Music Group and have an active relationship with each other and with domestic members of the Group. Defendants entered into cross-licensing agreements and developed a coordinated plan to distribute the Barbie Girl song in the United States (including California), and sent promotional copies of the Barbie Girl single and the *Aquarium* album to the United States (including California). This conduct was expressly aimed at, and allegedly caused harm in, California, Mattel's principal place of business. *See Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1321 (9th Cir.1998). Mattel's trademark claims would not have arisen "but for" the conduct foreign defendants purposefully directed toward California, and jurisdiction over the foreign defendants, who are represented by the same counsel and closely associated with the domestic defendants, is reasonable. *See id.* at 1321–22. The district court did not err in asserting specific personal jurisdiction over the foreign defendants.

**B.** Sales of the *Aquarium* album worldwide had a sufficient effect on American foreign commerce, and Mattel suffered monetary injury in the United States from those sales. *See Ocean Garden, Inc. v. Marktrade Co.,* 953 F.2d 500, 503 (9th Cir.1991). Moreover, Mattel's claim is more closely tied to interests of American foreign commerce than it is to the commercial interests of other nations: Mattel's principal place of business is in California, the foreign defendants are closely related to the domestic defendants, and Mattel

sought relief only for defendants' sales in the United States. *See Star–Kist Foods, Inc. v. P.J. Rhodes & Co.,* 769 F.2d 1393, 1395–96 (9th Cir.1985). The district court properly exercised extraterritorial jurisdiction under the Lanham Act.

### III

■ A. A trademark is a word, phrase or symbol that is used to identify a manufacturer or sponsor of a good or the provider of a service. *See New Kids on the Block v. News Am. Publ'g, Inc.,* 971 F.2d 302, 305 (9th Cir.1992). It's the owner's way of preventing others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner. A trademark "inform[s] people that trademarked products come from the same source." *Id.* at 305 n. 2. Limited to this core purpose—avoiding confusion in the marketplace—a trademark owner's property rights play well with the First Amendment. "Whatever first amendment rights you may have in calling the brew you make in your bathtub 'Pepsi' are easily outweighed by the buyer's interest in not being fooled into buying it." *Trademarks Unplugged,* 68 N.Y.U. L.Rev. 960, 973 (1993).

The problem arises when trademarks transcend their identifying purpose. Some trademarks enter our public discourse and become an integral part of our vocabulary. How else do you say that something's "the Rolls Royce of its class"? What else is a quick fix, but a Band–Aid? Does the average consumer know to ask for aspirin as "acetyl salicylic acid"? *See Bayer Co. v. United Drug Co.,* 272 F. 505, 510 (S.D.N.Y. 1921). Trademarks often fill in gaps in our vocabulary and add a contemporary flavor to our expressions. Once imbued with such expressive value, the trademark becomes a word in our language and as-

sumes a role outside the bounds of trademark law.

■ Our likelihood-of-confusion test, *see AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979), generally strikes a comfortable balance between the trademark owner's property rights and the public's expressive interests. But when a trademark owner asserts a right to control how we express ourselves—when we'd find it difficult to describe the product any other way (as in the case of aspirin), or when the mark (like Rolls Royce) has taken on an expressive meaning apart from its source-identifying function—applying the traditional test fails to account for the full weight of the public's interest in free expression.

■■ The First Amendment may offer little protection for a competitor who labels its commercial good with a confusingly similar mark, but "[t]rademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view." *L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 29 (1st Cir.1987). Were we to ignore the expressive value that some marks assume, trademark rights would grow to encroach upon the zone protected by the First Amendment. *See Yankee Publ'g, Inc. v. News Am. Publ'g, Inc.,* 809 F.Supp. 267, 276 (S.D.N.Y.1992) ("[W]hen unauthorized use of another's mark is part of a communicative message and not a source identifier, the First Amendment is implicated in opposition to the trademark right."). Simply put, the trademark owner does not have the right to control public discourse whenever the public imbues his mark with a meaning beyond its source-identifying function. *See Anti–Monopoly, Inc. v. Gen. Mills Fun Group,* 611 F.2d 296, 301 (9th Cir. 1979) ("It is the source-denoting function

which trademark laws protect, and nothing more.").

**B.** There is no doubt that MCA uses Mattel's mark: Barbie is one half of Barbie Girl. But Barbie Girl is the title of a song about Barbie and Ken, a reference that—at least today—can only be to Mattel's famous couple. We expect a title to describe the underlying work, not to identify the producer, and Barbie Girl does just that.

The Barbie Girl title presages a song about Barbie, or at least a girl like Barbie. The title conveys a message to consumers about what they can expect to discover in the song itself; it's a quick glimpse of Aqua's take on their own song. The lyrics confirm this: The female singer, who calls herself Barbie, is "a Barbie girl, in [her] Barbie world." She tells her male counterpart (named Ken), "Life in plastic, it's fantastic. You can brush my hair, undress me everywhere/Imagination, life is your creation." And off they go to "party." The song pokes fun at Barbie and the values that Aqua contends she represents. *See Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group,* 886 F.2d 490, 495–96 (2d Cir.1989). The female singer explains, "I'm a blond bimbo girl, in a fantasy world/Dress me up, make it tight, I'm your dolly."

The song does not rely on the Barbie mark to poke fun at another subject but targets Barbie herself. *See Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 580, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994); *see also Dr. Seuss Ents., L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1400 (9th Cir.1997). This case is therefore distinguishable from *Dr. Seuss,* where we held that the book *The Cat NOT in the Hat!* borrowed Dr. Seuss's trademarks and lyrics to get attention rather than to mock *The Cat in the Hat!* The defendant's use of the Dr. Seuss trademarks and copy-

righted works had "no critical bearing on the substance or style of" *The Cat in the Hat!,* and therefore could not claim First Amendment protection. *Id.* at 1401. *Dr. Seuss* recognized that, where an artistic work targets the original and does not merely borrow another's property to get attention, First Amendment interests weigh more heavily in the balance. *See id.* at 1400–02; *see also Harley–Davidson, Inc. v. Grottanelli,* 164 F.3d 806, 812–13 (2d Cir.1999) (a parodist whose expressive work aims its parodic commentary at a trademark is given considerable leeway, but a claimed parodic use that makes no comment on the mark is not a permitted trademark parody use).

The Second Circuit has held that "in general the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Rogers v. Grimaldi,* 875 F.2d 994, 999 (2d Cir.1989); *see also Cliffs Notes,* 886 F.2d at 494 (quoting *Rogers,* 875 F.2d at 999). *Rogers* considered a challenge by the actress Ginger Rogers to the film *Ginger and Fred.* The movie told the story of two Italian cabaret performers who made a living by imitating Ginger Rogers and Fred Astaire. *Rogers* argued that the film's title created the false impression that she was associated with it.

At first glance, Rogers certainly had a point. Ginger was her name, and Fred was her dancing partner. If a pair of dancing shoes had been labeled Ginger and Fred, a dancer might have suspected that Rogers was associated with the shoes (or at least one of them), just as Michael Jordan has endorsed Nike sneakers that claim to make you fly through the air. But *Ginger and Fred* was not a brand of shoe; it was the title of a movie and, for

the reasons explained by the Second Circuit, deserved to be treated differently.

A title is designed to catch the eye and to promote the value of the underlying work. Consumers expect a title to communicate a message about the book or movie, but they do not expect it to identify the publisher or producer. *See Application of Cooper*, 45 C.C.P.A. 923, 254 F.2d 611, 615–16 (C.C.P.A.1958) (A "title ... identifies a specific literary work, ... and is not associated in the public mind with the ... manufacturer." (internal quotation marks omitted)). If we see a painting titled "Campbell's Chicken Noodle Soup," we're unlikely to believe that Campbell's has branched into the art business. Nor, upon hearing Janis Joplin croon "Oh Lord, won't you buy me a Mercedes–Benz?," would we suspect that she and the carmaker had entered into a joint venture. A title tells us something about the underlying work but seldom speaks to its origin:

> Though consumers frequently look to the title of a work to determine what it is about, they do not regard titles of artistic works in the same way as the names of ordinary commercial products. Since consumers expect an ordinary product to be what the name says it is, we apply the Lanham Act with some rigor to prohibit names that misdescribe such goods. But most consumers are well aware that they cannot judge a book solely by its title any more than by its cover.

*Rogers*, 875 F.2d at 1000 (citations omitted).

■ *Rogers* concluded that literary titles do not violate the Lanham Act "unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." *Id.* at 999 (footnote omitted). We agree with the Second Circuit's analysis and adopt the *Rogers* standard as our own.

■ Applying *Rogers* to our case, we conclude that MCA's use of Barbie is not an infringement of Mattel's trademark. Under the first prong of *Rogers*, the use of Barbie in the song title clearly is relevant to the underlying work, namely, the song itself. As noted, the song is about Barbie and the values Aqua claims she represents. The song title does not explicitly mislead as to the source of the work; it does not, explicitly or otherwise, suggest that it was produced by Mattel. The *only* indication that Mattel might be associated with the song is the use of Barbie in the title; if this were enough to satisfy this prong of the *Rogers* test, it would render *Rogers* a nullity. We therefore agree with the district court that MCA was entitled to summary judgment on this ground. We need not consider whether the district court was correct in holding that MCA was also entitled to summary judgment because its use of Barbie was a nominative fair use.[2]

## IV

■ Mattel separately argues that, under the Federal Trademark Dilution Act ("FTDA"), MCA's song dilutes the Barbie mark in two ways: It diminishes the mark's capacity to identify and distinguish Mattel products, and tarnishes the mark because the song is inappropriate for

---

**2.** The likelihood-of-confusion test also governs Mattel's state law claims of unfair competition. *Cleary v. News Corporation*, 30 F.3d 1255, 1262–63 (9th Cir.1994) (citing *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir.1991)). Therefore, the district court properly granted summary judgment on these claims as well.

young girls. *See* 15 U.S.C. § 1125(c); *see also Panavision,* 141 F.3d at 1324.

■ "Dilution" refers to the "whittling away of the value of a trademark" when it's used to identify different products. 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24.67, at 24–120; § 24.70, at 24–122 (2001). For example, Tylenol snowboards, Netscape sex shops and Harry Potter dry cleaners would all weaken the "commercial magnetism" of these marks and diminish their ability to evoke their original associations. Ralph S. Brown, Jr., *Advertising and the Public Interest: Legal Protection of Trade Symbols,* 57 Yale L.J. 1165, 1187 (1948), *reprinted in* 108 Yale L.J. 1619 (1999). These uses dilute the selling power of these trademarks by blurring their "uniqueness and singularity," Frank I. Schechter, *The Rational Basis of Trademark Protection,* 40 Harv. L.Rev. 813, 831 (1927), and/or by tarnishing them with negative associations.

■ By contrast to trademark infringement, the injury from dilution usually occurs when consumers *aren't* confused about the source of a product: Even if no one suspects that the maker of analgesics has entered into the snowboard business, the Tylenol mark will now bring to mind two products, not one. Whereas trademark law targets "interference with the source signaling function" of trademarks, dilution protects owners "from an appropriation of or free riding on" the substantial investment that they have made in their marks. *I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 50 (1st Cir.1998).

Originally a creature of state law, dilution received nationwide recognition in 1996 when Congress amended the Lanham Act by enacting the FTDA.[3] The statute protects "[t]he owner of a famous mark … against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c). Dilutive uses are prohibited unless they fall within one of the three statutory exemptions discussed below. *See* pp. 904–07 *infra.* For a lucid and scholarly discussion of the statutory terms, as well as the purposes of the federal dilution statute, we refer the reader to Judge Leval's opinion in *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 214–17 (2d Cir.1999). Barbie easily qualifies under the FTDA as a famous and distinctive mark, and reached this status long before MCA began to market the Barbie Girl song. The commercial success of Barbie Girl establishes beyond dispute that the Barbie mark satisfies each of these elements.

■ We are also satisfied that the song amounts to a "commercial use in commerce." Although this statutory language is ungainly, its meaning seems clear: It refers to a use of a famous and distinctive mark to sell goods other than those produced or authorized by the mark's owner. *Panavision,* 141 F.3d at 1324–25. That is precisely what MCA did with the Barbie mark: It created and sold to consumers in the marketplace commercial products (the Barbie Girl single and the *Aquarium* album) that bear the Barbie mark.

MCA's use of the mark is dilutive. MCA does not dispute that, while a refer-

---

3. Even at the state level, dilution is of relatively recent vintage. The first anti-dilution statute was enacted in Massachusetts in 1947, *see* Mass. Gen. Laws Ann. Ch. 110B, § 12 (West 1992). By the time the FTDA was enacted in 1996, only twenty-six states had anti-dilution statutes on the books. *See* 4 *McCarthy* § 24:80, at 24–136.2 n. 2; H.R.Rep. No. 104–374, at 3–4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 1029, 1030–31.

ence to Barbie would previously have brought to mind only Mattel's doll, after the song's popular success, some consumers hearing Barbie's name will think of both the doll and the song, or perhaps of the song only.[4] This is a classic blurring injury and is in no way diminished by the fact that the song itself refers back to Barbie the doll. To be dilutive, use of the mark need not bring to mind the junior user alone. The distinctiveness of the mark is diminished if the mark no longer brings to mind the senior user alone.[5]

We consider next the applicability of the FTDA's three statutory exemptions. These are uses that, though potentially dilutive, are nevertheless permitted: comparative advertising; news reporting and commentary; and noncommercial use. 15 U.S.C. § 1125(c)(4)(B). The first two exemptions clearly do not apply; only the exemption for noncommercial use need detain us.

A "noncommercial use" exemption, on its face, presents a bit of a conundrum because it seems at odds with the earlier requirement that the junior use be a "commercial use in commerce." If a use has to be commercial in order to be dilutive, how then can it also be noncommercial so as to satisfy the exception of section 1125(c)(4)(B)? If the term "commercial use" had the same meaning in both provisions, this would eliminate one of the three statutory exemptions defined by this subsection, because any use found to be dilutive would, of necessity, not be noncommercial.

Such a reading of the statute would also create a constitutional problem, because it would leave the FTDA with no First Amendment protection for dilutive speech other than comparative advertising and news reporting. This would be a serious problem because the primary (usually exclusive) remedy for dilution is an injunction.[6] As noted above, tension with the First Amendment also exists in the trademark context, especially where the mark has assumed an expressive function beyond mere identification of a product or service. *See* pp. 900–901 *supra; New Kids on the Block*, 971 F.2d at 306–08. These concerns apply with greater force in the dilution context because dilution lacks two very significant limitations that reduce the tension between trademark law and the First Amendment.

First, depending on the strength and distinctiveness of the mark, trademark law grants relief only against uses that are likely to confuse. *See* 5 *McCarthy* § 30:3, at 30–8 to 30–11; *Restatement* § 35 cmt. c at 370. A trademark injunction is usually limited to uses within one industry or several related industries. Dilution law is the antithesis of trademark law in this respect, because it seeks to protect the mark from association in the public's mind with wholly unrelated goods and services. The more remote the good or service associated with the junior use, the more likely it is to cause dilution rather than trademark infringement. A dilution injunction, by contrast to a trade-

---

4. The Supreme Court will soon decide whether the owner of a famous mark must show economic injury to show dilution or whether potential injury is sufficient. *Moseley v. V Secret Catalogue, Inc.*, —— U.S. ——, 122 S.Ct. 1536, 152 L.Ed.2d 463 (2002). Because MCA did not challenge Mattel's showing as insufficient on this ground, we do not address it.

5. Because we find blurring, we need not consider whether the song also tarnished the Barbie mark.

6. The FTDA provides for both injunctive relief and damages, but the latter is only available if plaintiff can prove a willful intent to dilute. 15 U.S.C. § 1125(c)(2).

mark injunction, will generally sweep across broad vistas of the economy.

■ Second, a trademark injunction, even a very broad one, is premised on the need to prevent consumer confusion. This consumer protection rationale—averting what is essentially a fraud on the consuming public—is wholly consistent with the theory of the First Amendment, which does not protect commercial fraud. *Cent. Hudson Gas & Elec. v. Pub. Serv. Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *see Thompson v. W. States Med. Ctr.,* —— U.S. ——, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002) (applying *Central Hudson*). Moreover, avoiding harm to consumers is an important interest that is independent of the senior user's interest in protecting its business.

■ Dilution, by contrast, does not require a showing of consumer confusion, 15 U.S.C. § 1127, and dilution injunctions therefore lack the built-in First Amendment compass of trademark injunctions. In addition, dilution law protects only the distinctiveness of the mark, which is inherently less weighty than the dual interest of protecting trademark owners and avoiding harm to consumers that is at the heart of every trademark claim.

■ Fortunately, the legislative history of the FTDA suggests an interpretation of the "noncommercial use" exemption that both solves our interpretive dilemma and diminishes some First Amendment concerns: "Noncommercial use" refers to a use that consists entirely of noncommercial, or fully constitutionally protected, speech. *See* 2 Jerome Gilson et al., *Trademark Protection and Practice* § 5.12[1][c][vi], at 5–240 (this exemption "is intended to prevent the courts from enjoining speech that has been recognized to be [fully] constitutionally protected," "such as parodies"). Where, as here, a statute's plain meaning "produces an absurd, and perhaps unconstitutional, result[, it is] entirely appropriate to consult all public materials, including the background of [the statute] and the legislative history of its adoption." *Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 527, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring).

■ The legislative history bearing on this issue is particularly persuasive. First, the FTDA's sponsors in both the House and the Senate were aware of the potential collision with the First Amendment if the statute authorized injunctions against protected speech. Upon introducing the counterpart bills, sponsors in each house explained that the proposed law "will not prohibit or threaten noncommercial expression, such as parody, satire, editorial and other forms of expression that are not a part of a commercial transaction." 141 Cong. Rec. S19306–10, S19310 (daily ed. Dec. 29, 1995) (statement of Sen. Hatch); 141 Cong. Rec. H14317–01, H14318 (daily ed. Dec. 12, 1995) (statement of Rep. Moorhead). The House Judiciary Committee agreed in its report on the FTDA. H.R.Rep. No. 104–374, at 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 1029, 1031 ("The bill will not prohibit or threaten 'noncommercial' expression, as that term has been defined by the courts.").[7]

---

7. Our interpretation of the noncommercial use exemption does not eliminate all tension between the FTDA and the First Amendment because the exemption does not apply to commercial speech, which enjoys "qualified but nonetheless substantial protection." *Bolger v.*

*Youngs Drug Prod's Corp.,* 463 U.S. 60, 68, 103 S.Ct. 2875 (1983) (applying *Central Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). *See also Thompson,* —— U.S. at ——, 122 S.Ct. at 1503–04 (same). It

The FTDA's section-by-section analysis presented in the House and Senate suggests that the bill's sponsors relied on the "noncommercial use" exemption to allay First Amendment concerns. H.R. Rep. No. 104–374, at 8, *reprinted in* 1995 U.S.C.C.A.N. 1029, 1035 (the exemption "expressly incorporates the concept of 'commercial' speech from the 'commercial speech' doctrine, and proscribes dilution actions that seek to enjoin use of famous marks in 'non-commercial' uses (such as consumer product reviews)"); 141 Cong. Rec. S19306–10, S19311 (daily ed. Dec. 29, 1995) (the exemption "is consistent with existing case law[, which] recognize[s] that the use of marks in certain forms of artistic and expressive speech is protected by the First Amendment"). At the request of one of the bill's sponsors, the section-by-section analysis was printed in the Congressional Record. 141 Cong. Rec. S19306–10, S19311 (daily ed. Dec. 29, 1995). Thus, we know that this interpretation of the exemption was before the Senate when the FTDA was passed, and that no senator rose to dispute it.

 To determine whether Barbie Girl falls within this exemption, we look to our definition of commercial speech under our First Amendment caselaw. *See* H.R.Rep. No. 104–374, at 8, *reprinted in* 1995 U.S.C.C.A.N. 1029, 1035 (the exemption "expressly incorporates the concept of 'commercial' speech from the 'commercial speech' doctrine"); 141 Cong. Rec. S19306–10, S19311 (daily ed. Dec. 29, 1995) (the exemption "is consistent with existing [First Amendment] case law"). "Although the boundary between commercial and noncommercial speech has yet to be clearly delineated, the 'core notion of commercial speech' is that it 'does no more than propose a commercial transaction.'" *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1184 (9th Cir.2001) (quoting *Bolger v. Youngs Drug Prod's Corp.*, 463 U.S. 60, 66, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983)). If speech is not "purely commercial"—that is, if it does more than propose a commercial transaction—then it is entitled to full First Amendment protection. *Id.* at 1185–86 (internal quotation marks omitted).

In *Hoffman*, a magazine published an article featuring digitally altered images from famous films. Computer artists modified shots of Dustin Hoffman, Cary Grant, Marilyn Monroe and others to put the actors in famous designers' spring fashions; a still of Hoffman from the movie "Tootsie" was altered so that he appeared to be wearing a Richard Tyler evening gown and Ralph Lauren heels. Hoffman, who had not given permission, sued under the Lanham Act and for violation of his right to publicity. *Id.* at 1183.

The article featuring the altered image clearly served a commercial purpose: "to draw attention to the for-profit magazine in which it appear[ed]" and to sell more copies. *Id.* at 1186. Nevertheless, we held that the article was fully protected under the First Amendment because it included protected expression: "humor" and "visual and verbal editorial comment on classic films and famous actors." *Id.* at 1185 (internal quotation marks omitted). Because its commercial purpose was "inextricably entwined with [these] expressive elements," the article and accompanying photographs enjoyed full First Amendment protection. *Id.*

*Hoffman* controls: Barbie Girl is not purely commercial speech, and is therefore

is entirely possible that a dilution injunction against purely commercial speech would run afoul of the First Amendment. Because that question is not presented here, we do not address it.

fully protected. To be sure, MCA used Barbie's name to sell copies of the song. However, as we've already observed, *see* pp. 901–02 *supra,* the song also lampoons the Barbie image and comments humorously on the cultural values Aqua claims she represents. Use of the Barbie mark in the song Barbie Girl therefore falls within the noncommercial use exemption to the FTDA. For precisely the same reasons, use of the mark in the song's title is also exempted.

V

 Mattel next argues that the district court erred in granting summary judgment for the foreign defendants on its unfair competition claim under the Paris Convention for the Protection of Industrial Property, Mar. 20, 1883, as revised at Stockholm, July 14, 1967, art. 10bis, 21 U.S.T. 1583, 1648, 828 U.N.T.S. 305, 337 (hereinafter Paris Convention). Mattel grounds its claim on Article 10bis, which provides that "[t]he countries of the Union are bound to assure to nationals of such countries effective protection against unfair competition." Paris Convention, art. 10bis, 21 U.S.T. at 1648, 828 U.N.T.S. at 337. Mattel asserts that Article 10bis creates a federal cause of action for unfair competition in international disputes, and that section 44 of the Lanham Act, 15 U.S.C. § 1126, makes the substantive provisions of the Paris Convention available to United States nationals.

 In *Toho Co. v. Sears, Roebuck & Co.,* 645 F.2d 788, 790–92 (9th Cir.1981), the Japanese producer and distributor of "Godzilla" asserted a claim against the manufacturer of "Bagzilla" garbage bags based on a "federal law of unfair competition." Subsection 44(b) gives to "persons whose country of origin is a party to any [trademark] convention or treaty ... to which the United States is also a party"

the benefits of section 44 to the extent necessary to give effect to the provisions of those treaties. 15 U.S.C. § 1126(b). These benefits include "effective protection against unfair competition." 15 U.S.C. § 1126(h). Thus, a foreign national is granted protection against unfair competition consistent with the protections of applicable trademark treaties.

 However, we made clear in *Toho* that subsection 44(h) does not create a general federal law of unfair competition. *See* 645 F.2d at 792; *see also Int'l Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 915–16, 916 n. 5 (9th Cir.1980). Rather, "[t]he grant in subsection (h) of effective protection against unfair competition is tailored to the provisions of the unfair competition treaties by subsection (b), which extends the benefits of section 44 only to the extent necessary to give effect to the treaties." *Toho,* 645 F.2d at 792. Subsection 44(h) creates a federal right that is coextensive with the substantive provisions of the treaty involved. *See id.* Because the treaty involved in *Toho* required that Japanese corporations be treated as favorably as domestic companies with respect to unfair competition claims, we held that subsection 44(h) provided Toho with a federal forum in which to bring its *state* unfair competition claims. *See id.*

 Subsection 44(i) goes no farther. It does not create a federal cause of action where subsection 44(h) would not, because it provides only that United States citizens "shall have the same benefits as are granted by this section to persons described in subsection (b) of this section." 15 U.S.C. § 1126(i). And, "so far as concerns 'unfair competition,' those 'benefits' are limited to such as may be found in some 'convention or treaty relating to ... the repression of unfair competition.' The purpose of [sub-

section 44(i)], quite clearly, is no more than to extend to citizens and residents those 'benefits' that any 'convention or treaty' gives to aliens, including the same remedies for 'protection against unfair competition' that subsection (h) gives to aliens." *Am. Auto. Ass'n v. Spiegel,* 205 F.2d 771, 775 (2d Cir.1953). The only protection against unfair competition that subsection 44(h) grants to foreign nationals, and that subsection 44(i) therefore grants to American citizens, is that "necessary to give effect to any provisions of [trademark treaties]." 15 U.S.C. § 1126(b). Therefore, Mattel's federal unfair competition claim depends on the extent to which the substantive provisions of the Paris Convention create one.

■ However, we've also held that "the Paris Convention was not intended to define the substantive law in the area of 'unfair competition' of the signatory countries." *Kemart Corp. v. Printing Arts Research Labs., Inc.,* 269 F.2d 375, 389 (9th Cir.1959). The Paris Convention does not provide substantive rights but ensures "national treatment." 4 *McCarthy* § 29:25. That is, it requires that "foreign nationals ... be given the same treatment in each of the member countries as that country makes available to its own citizens." *Vanity Fair Mills v. T. Eaton,* 234 F.2d 633, 640 (2d Cir.1956).

■ Section 44 and the Paris Convention therefore interact as follows: A foreign national is entitled to the same "effective protection against unfair competition" to which an American is entitled, Paris Convention, art. 10bis, and in turn, the American gets the same right that the foreign national gets. We treat Mattel like a foreign national, who is treated like an American under the Paris Convention. Accordingly, Mattel is entitled to assert a cause of action under the Lanham Act for trademark infringement, 15 U.S.C. § 1114,

or for false designation of origin, 15 U.S.C. § 1125, or it may assert state law claims for unfair competition, as it did. *See* n. 2 *supra.* But Mattel has no claim to a non-existent federal cause of action for unfair competition. As said, the Paris Convention provides for national treatment, and does not define the substantive law of unfair competition. We therefore reject Mattel's argument that a treaty provision providing for "national treatment" gives it more protections against foreign nationals than it has against U.S. nationals.

## VI

■ After Mattel filed suit, Mattel and MCA employees traded barbs in the press. When an MCA spokeswoman noted that each album included a disclaimer saying that Barbie Girl was a "social commentary [that was] not created or approved by the makers of the doll," a Mattel representative responded by saying, "That's unacceptable.... It's akin to a bank robber handing a note of apology to a teller during a heist. [It n]either diminishes the severity of the crime, nor does it make it legal." He later characterized the song as a "theft" of "another company's property."

MCA filed a counterclaim for defamation based on the Mattel representative's use of the words "bank robber," "heist," "crime" and "theft." But all of these are variants of the invective most often hurled at accused infringers, namely "piracy." No one hearing this accusation understands intellectual property owners to be saying that infringers are nautical cutthroats with eye-patches and peg legs who board galleons to plunder cargo. In context, all these terms are nonactionable "rhetorical hyperbole," *Gilbrook v. City of Westminster,* 177 F.3d 839, 863 (9th Cir.1999). The parties are advised to chill.

**AFFIRMED.**

## APPENDIX

"Barbie Girl" by Aqua

-Hiya Barbie!

-Hi Ken!

You wanna go for a ride?

-Sure, Ken!

-Jump in!

-Ha ha ha ha!

(CHORUS:)

I'm a Barbie girl, in my Barbie world

Life in plastic, it's fantastic

You can brush my hair, undress me everywhere

Imagination, life is your creation

Come on Barbie, let's go party!

(CHORUS)

I'm a blonde bimbo girl, in a fantasy world

Dress me up, make it tight, I'm your dolly

You're my doll, rock and roll, feel the glamour in pink

Kiss me here, touch me there, hanky-panky

You can touch, you can play

If you say "I'm always yours," ooh ooh

(CHORUS)

(BRIDGE:)

Come on, Barbie, let's go party, ah ah ah yeah

Come on, Barbie, let's go party, ooh ooh, ooh ooh

Come on, Barbie, let's go party, ah ah ah yeah

Come on, Barbie, let's go party, ooh ooh, ooh ooh

Make me walk, make me talk, do whatever you please

I can act like a star, I can beg on my knees

Come jump in, be my friend, let us do it again

Hit the town, fool around, let's go party

You can touch, you can play

You can say "I'm always yours"

You can touch, you can play

You can say "I'm always yours"

(BRIDGE)

(CHORUS x2)

(BRIDGE)

-Oh, I'm having so much fun!

-Well, Barbie, we're just getting started!

-Oh, I love you Ken!