NISSAN MOTOR CO., LTD., a Japanese corporation; Nissan North America, Inc., a California corporation, Plaintiffs,

v.

NISSAN COMPUTER CORPORATION, a North Carolina corporation; et al., Defendants.

No. CV 99–12980 DDP (MCX).

United States District Court, C.D. California.

Nov. 13, 2002.

Mark A. Flagel, Daniel Scott Schecter, Michael Jon Lawrence, David J. Schindler, Latham & Watkins, Los Angeles, CA, for Plaintiffs.

Bruce R Fertel, Fertel & Associates, Beverly Hills, CA, for Defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR A PERMANENT INJUNCTION

PREGERSON, District Judge.

This matter comes before the Court on the plaintiffs' motion for a permanent injunction. After reviewing and considering

the materials submitted by the parties and hearing oral arguments, the Court grants the motion as set forth below.

**BACKGROUND**

The plaintiffs, Nissan Motor Co., Ltd. and Nissan North America, Inc. (collectively, "Nissan Motor"), and the defendants, Nissan Computer Corporation ("NCC") and The Internet Center, Inc. ("IC"), are familiar with the extensive factual and procedural background in this case. Therefore, only an abbreviated history is set forth below.

NCC is a North Carolina corporation in the business of computer sales and services. It was incorporated in 1991 by its current president, Mr. Uzi Nissan. IC is a North Carolina corporation formed in 1995 as an Internet Service Provider. Nissan Motor Co., Ltd. is a large Japanese automaker. Its subsidiary, plaintiff Nissan North America, Inc., markets and distributes Nissan vehicles in the United States.

At issue in this case is NCC's ownership and use of the Internet domain names "nissan.com" and "nissan.net," registered in 1994 and 1996, respectively. Following unsuccessful negotiations regarding the possible transfer from NCC to the plaintiffs of the domain name "nissan.com," the plaintiffs filed a complaint against NCC in December 1999. The complaint asserted claims for (1) trademark dilution in violation of federal and state law; (2) trademark infringement; (3) domain name piracy; (4) false designation of origin; and (5) state law unfair competition. The Court denied the plaintiffs' application for a temporary restraining order. Subsequently the plaintiffs filed an amended complaint, and NCC filed various counterclaims and an amended answer. In November 2001, the Court granted the plaintiffs' motion to add IC as a defendant.

In early 2002, the Court issued, among other things, certain orders granting the plaintiffs' motion for partial summary judgment as to the infringement of automobile-related goods/services and granting NCC's motion for partial summary judgment as to the plaintiffs' claim of cybersquatting. In August 2002, the Court granted the plaintiffs' motion for summary judgment on their dilution claim against NCC, and the plaintiffs' motion for summary judgment on their alter ego and dilution claims against IC.

The plaintiffs' motion for a permanent injunction is before the Court. The plaintiffs move the Court for a permanent injunction against NCC's and IC's uses of the domain names "nissan.com" and "nissan.net." Further, the plaintiffs seek transfer of the domain names from NCC and IC to the plaintiffs. The plaintiffs also request the Court to order NCC and IC to post captions and disclaimers on "nissan.com" and "nissan.net," prior to the transfer. Last, the plaintiffs move the Court to order NCC and IC to refrain from posting links to commercial merchandising websites, websites containing negative commentary or remarks regarding the plaintiffs, and other activities that allegedly dilute the plaintiffs' mark.

The defendants argue that "[g]iven Nissan Computer's vested property rights in the domain names, demonstrated willingness to comply with this Court's orders, and voluntary reformations of its websites, transfer of nissan.com and nissan.net is not necessary to protect Nissan Motor's mark." (NCC Opp. at 1.) The defendants argue that an injunction need not issue in this case because the specific injunction sought by Nissan Motor—transferring the domain names—is not warranted. (*See* Opp. at 25.) Among other things, the defendants argue that the requested permanent injunction constitutes an impermissible retroactive application of the law and would violate the defendants' First Amendment rights.

## DISCUSSION

### A. Legal Standard

Under the Federal Trademark Dilution Act (the "FTDA"), 15 U.S.C. § 1125(c)(1), "[t]he owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name ...." Despite the defendants' attempt to argue that *any* permanent injunction is unwarranted, the issues raised in conjunction with this motion primarily involve the scope of such an injunction.

### B. Analysis

#### 1) The Relief Sought Is Not Impermissibly Retroactive

■ As an initial matter, the defendants argue that an injunction cannot be granted here, as the granting of such an injunction would be an impermissible retroactive application of the FTDA. The defendants rely on *Circuit City Stores, Inc. v. OfficeMax, Inc.*, 949 F.Supp. 409 (E.D.Va.1996), for the proposition that mere ownership of the domain names—which began prior to the enactment of the FTDA—cannot support the requested injunctive relief. (*See* Opp. at 7.)

However, liability has been found in this case; the relief requested is prospective and is not intended to punish the defendants for pre-enactment activities. *Circuit City* notwithstanding, injunctive relief under these circumstances is supported by relevant case law. *See Viacom Inc. v. Ingram Enters., Inc.*, 141 F.3d 886, 889 (8th Cir.1998) (rejecting *Circuit City* on the ground that, among other things, "the conduct sought to be enjoined under the FTDA is Ingram's continuing use of its BLOCKBUSTER marks, not its pre-enactment conduct."); *Fuente Cigar, Ltd. v. Opus One*, 985 F.Supp. 1448, 1451–52 (M.D.Fla.1997) (in evaluating 1125(c) claim, the court rejects *Circuit City*; "Because prospective relief, by its very nature, attaches legal (as opposed to practical) consequences only to events after the statute's enactment, it has no retroactive effect."). The Court finds that the Supreme Court envisioned a situation such as this when it wrote: "Even absent specific legislative authorization, application of new statutes passed after the events in suit is unquestionably proper in many situations. When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 273, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). A permanent injunction is an appropriate remedy in this case.

#### 2) The Plaintiffs Are Entitled to an Injunction that Prohibits Commercial Content at Nissan.com and Nissan.net

■ In granting summary judgment, the Court held that "NCC's use of the 'Nissan' mark as a domain name 'whittles away' the distinctiveness of the 'Nissan' mark and the ability of the mark to serve as a unique identifier of Nissan's products." (8/27/02 Order Granting Summ. Judg. at 25.) Thus the Court found that the defendants' use of those domain names constituted dilution.

■ However, in objecting to the permanent injunction sought by the plaintiffs, the defendants correctly point out that not all uses of domain names constitute unlawful dilution under the FTDA. As recognized recently by the Ninth Circuit in *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 905 (9th Cir.2002), noncommercial speech is exempted from the FTDA. Dilution law "seeks to protect the mark from association in the public's mind with wholly unrelated goods and services." *Id.*

at 904. However, the FTDA is not intended to prohibit or threaten "noncommercial expression, such as parody, satire, editorial and other forms of expression that are not a part of a commercial transaction." *Id.* at 905 (quoting statements by the FTDA's sponsors in Congress). "[T]he 'noncommercial use' exemption [was intended] to allay First Amendment concerns." *Id.* at 906.

■ At oral argument, the plaintiffs urged that, given the famousness of the "Nissan" mark and the related expectations of individuals going to nissan.com or nissan.net, *any* use of those domain names is commercial in nature. The Court is not persuaded by this argument. As the Court wrote in a prior opinion, "[t]he mere use of another's name on the Internet, however, is not per se commercial use." *Bally Total Fitness Holding Corp. v. Faber,* 29 F.Supp.2d 1161, 1166 (C.D.Cal.1998). Indeed, it is unclear how there is anything commercial about the defendants using nissan.com to post, for instance, family photographs. While visitors to nissan.com or nissan.net might expect commercial content, this fact is not sufficient grounds to bring otherwise noncommercial speech within the reach of the FTDA. Similarly, while the fact that Nissan Motor would not reap the commercial benefits of nissan.com and nissan.net were they to be retained by the defendants, the Court does not believe that such an argument transforms noncommercial use of the domain names into commercial use for purposes of the FTDA. *See Ford Motor Co. v. 2600 Enters.,* 177 F.Supp.2d 661, 664 (E.D.Mich.2001) ("[T]he implication ... that the 'commercial use' requirement is satisfied any time unauthorized use of a protected mark hinders the mark owner's ability to establish a presence on the Internet or otherwise disparages the mark owner is flawed."). Dilution was found in this case because the domain names were, in fact, being employed for a commercial purpose; the defendants may continue to use the domain names as long as they are used for noncommercial purposes.

The Court concludes, however, that disparaging remarks or negative commentary at nissan.com and nissan.net (and links to such content) are sufficiently commercial to bring the defendants' use of the domain names within the scope of the FTDA, and therefore should be precluded. The Court notes that the use of a mark to criticize a company is not inherently commercial speech. Courts have thus permitted the posting of this type of speech at websites under the noncommercial speech exemption. *See e.g., Ford Motor Co.,* 177 F.Supp.2d at 665 (discussing "fuckgeneralmotors.com": "If the FTDA's 'commercial use' requirement is to have any meaning, it cannot be interpreted so broadly as to include any use that might disparage or otherwise commercially harm the mark owner."); *Bally,* 29 F.Supp.2d at 1167 (discussing "www.compupix.com/ballysucks": "trademark owners may not quash unauthorized use of the mark by a person expressing a point of view"). However, unlike *Ford Motor Co.* and *Bally,* the instant case presents a situation in which the mark *itself* is also the domain name. The goodwill that Nissan Motor has built up in the "Nissan" mark ensures a steady stream of visitors expecting to find Nissan Motor at nissan.com and nissan.net. Critical commentary at nissan.com and nissan.net would exploit this goodwill in order to injure Nissan Motor. Under these circumstances, the critical speech becomes commercial and is subject to the proscriptions of the FTDA. However, like the defendants in *Ford Motor Co.* and *Bally,* the defendants in this case are free to post critical commentary on other websites, as they have already done at ncchelp.org.

Permitting the defendants to retain the domain names subject to the limitation on

critical speech is consistent with the equities in this case. As this Court has pointed out in the context of the plaintiffs' cybersquatting claim, the fact that the domain name consists of the surname of the owner of the corporation distinguishes the instant case from traditional cybersquatting cases. (1/9/02 Order Re Cybersquatting at 9.) Similarly, the defendants do not have a pattern of registering famous trademarks and seeking to extort payment from trademark owners. (*Id.*)

Refraining from requiring the transfer of the domain names is also consistent with the mandate that injunctions be as narrow as possible. *See Carroll v. President & Comm'rs of Princess Anne,* 393 U.S. 175, 184, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968) (an "order must be tailored as precisely as possible to the exact needs of the case."); *CPC Int'l, Inc. v. Skippy Inc.,* 214 F.3d 456, 461 (4th Cir.2000) ("Injunctions must be narrowly tailored and should prohibit only unlawful conduct."). In granting an injunction enjoining the defendants from using the nissan.com and nissan.net domain names for commercial purposes, the Court's order will do all that is necessary to prohibit unlawful conduct by the defendants.

**CONCLUSION**

Given the Court's granting of summary judgment and the considerations outlined above, NCC and IC are hereby enjoined from the following:

1) Posting commercial content at nissan.com and nissan.net;

2) Posting advertising (and permitting advertising to be posted by third parties) at nissan.com and nissan.net;

3) Posting disparaging remarks or negative commentary regarding Nissan Motor Co., Ltd. or Nissan North America, Inc. at nissan.com and nissan.net;

4) Placing, on nissan.com or nissan.net, links to other websites containing commercial content, including advertising; and

5) Placing, on nissan.com or nissan.net, links to other websites containing disparaging remarks or negative commentary regarding Nissan Motor Co., Ltd. or Nissan North America, Inc.

IT IS SO ORDERED.