**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CHRISTOPHER GORDON, an individual,<br><br>*Plaintiff-Appellant*,<br><br>v.<br><br>DRAPE CREATIVE, INC., a Missouri corporation; PAPYRUS-RECYCLED GREETINGS, INC., an Illinois corporation,<br><br>*Defendants-Appellees.* | No. 16-56715<br><br>D.C. No. 2:15-cv-04905-JFW-PLA<br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted April 9, 2018
Pasadena, California

Filed July 30, 2018

Before: Danny J. Boggs,[*] Jay S. Bybee,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Bybee

---

[*] The Honorable Danny J. Boggs, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Trademark

The panel reversed the district court's grant of summary judgment in favor of defendants in a trademark infringement suit under the Lanham Act.

Defendants designed and produced greeting cards using "Honey Badger" catchphrases from plaintiff Christopher Gordon's YouTube video.

Under the *Rogers* test, the Lanham Act applies to expressive works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression. This balance will normally not support application of the Act unless the use of the mark has no artistic relevance to the underlying work whatsoever or explicitly misleads consumers as to the source or the content of the work.

The panel held that there was a triable issue of fact because a jury could determine that defendants did not add any value protected by the First Amendment, but merely appropriated the goodwill associated with Gordon's mark. The panel reversed the district court and remanded for further proceedings on Gordon's claims.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Daniel L. Reback (argued) and Ralph C. Loeb, Krane & Smith, Encino, California, for Plaintiff-Appellant.

Douglas J. Collodel (argued), Kanika D. Corley, and James J.S. Holmes, Sedgwick LLP, Los Angeles, California, for Defendants-Appellees.

**OPINION**

BYBEE, Circuit Judge:

Plaintiff Christopher Gordon is the creator of a popular YouTube video known for its catchphrases "Honey Badger Don't Care" and "Honey Badger Don't Give a S---." Gordon has trademarked the former phrase for various classes of goods, including greeting cards. Defendants Drape Creative, Inc. ("DCI"), and Papyrus-Recycled Greetings, Inc. ("PRG"), designed and produced greeting cards using both phrases with slight variations. Gordon brought this suit for trademark infringement, and the district court granted summary judgment for defendants, holding that Gordon's claims were barred by the test set forth in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989).

We use the *Rogers* test to balance the competing interests at stake when a trademark owner claims that an expressive work infringes on its trademark rights. The test construes the Lanham Act to apply to expressive works "only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Id*. at 999. "[T]hat balance will normally not support application of the Act,

unless the [use of the mark] has no artistic relevance to the underlying work whatsoever, or . . . explicitly misleads [consumers] as to the source or the content of the work." *Id.*

The *Rogers* test is not an automatic safe harbor for any minimally expressive work that copies someone else's mark. Although on every prior occasion in which we have applied the test, we have found that it barred an infringement claim as a matter of law, this case presents a triable issue of fact. Defendants have not used another's mark in the creation of a song, photograph, video game, or television show, but have largely just pasted Gordon's mark into their greeting cards. A jury could determine that defendants did not add any value protected by the First Amendment but merely appropriated the goodwill associated with Gordon's mark. We therefore reverse the district court's grant of summary judgment and remand for further proceedings on Gordon's claims.

I

Plaintiff Christopher Gordon is a comedian, writer, and actor, who commonly uses the name "Randall" as an alias on social media.[1]  Defendant DCI is a greeting-card design studio.  DCI works exclusively with American Greetings Corporation and its subsidiaries, which include the other defendant in this case, PRG.  PRG is a greeting-card manufacturer and distributor.

---

[1] Because this case comes to us on appeal from a grant of summary judgment for defendants, we recount the facts in the light most favorable to Gordon. *See VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871, 875 (9th Cir. 2016).

A

In January 2011, under the name Randall, Gordon posted a video on YouTube titled *The Crazy Nastyass Honey Badger*, featuring National Geographic footage of a honey badger overlaid with Gordon's narration. In the video, Gordon repeats variations of the phrases "Honey Badger Don't Care" and "Honey Badger Don't Give a S---," as a honey badger hunts and eats its prey. The parties refer to these phrases as "HBDC" and "HBDGS," and we adopt their convention.

Gordon's video quickly generated millions of views on YouTube and became the subject of numerous pop-culture references in television shows, magazines, and social media. As early as February 2011, Gordon began producing and selling goods with the HBDC or HBDGS phrases, such as books, wall calendars, t-shirts, costumes, plush toys, mouse pads, mugs, and decals. Some of the items were sold online; others were sold through national retailers such as Wal-Mart, Target, Urban Outfitters, and Hot Topic. In June 2011, Gordon copyrighted his video's narration under the title *Honey Badger Don't Care*, and in October 2011, he began filing trademark applications for the HBDC phrase for various classes of goods. The Patent and Trademark Office ("PTO") eventually registered "Honey Badger Don't Care" for International Classes 9 (audio books, etc.), 16 (greeting cards, etc.), 21 (mugs), 25 (clothing), and 28 (Christmas

decorations, dolls, etc.).[2]  However, Gordon never registered the HBDGS phrase for any class of goods.

At the peak of his popularity, Gordon promoted his brand on television and radio shows and in interviews with national publications such as *Forbes*, *The Wall Street Journal*, and *The Huffington Post*.  His brand was further boosted by celebrities like Taylor Swift and Anderson Cooper quoting his video and by LSU football players tagging their teammate, Heisman Trophy finalist Tyrann Mathieu, with the moniker "Honey Badger" for his aggressive defensive play.  In November 2011, *Advertising Age* referred to Gordon's brand as one of "America's Hottest Brands" in an article titled "Hot Brand?  Honey Badger Don't Care."

B

In January 2012, Gordon hired Paul Leonhardt to serve as his licensing agent.  Soon thereafter, Leonhardt contacted Janice Ross at American Greetings—the parent company of defendant PRG—to discuss licensing honey-badger themed greeting cards.  Leonhardt and Ross had multiple email exchanges and conversations over several weeks.  Ross at one point expressed some interest in a licensing agreement, stating: "I think it's a really fun and irreverent property and would love to see if there's an opportunity on one of our distribution platforms.  But in order to do that, I need to get

---

[2] Between January 2013 and April 2014, the PTO issued registrations for HBDC in International Classes 9, 21, 25, and 28.  The PTO did not issue a registration for HBDC in International Class 16—which includes greeting cards—until October 2016, well after Gordon filed this suit.  The timing of Gordon's registrations, however, is immaterial to the *Rogers* inquiry.

some key colleagues of mine on board the Crazy Honey Badger Bandwagon." Nevertheless, neither American Greetings nor defendants ever signed a licensing agreement with Gordon.

Leonhardt did eventually secure several licensing deals for Gordon. Between May and October 2012, Gordon's company—Randall's Honey Badger, LLC ("RHB")—entered into licensing agreements with Zazzle, Inc., and The Duck Company for various honey-badger themed products, including greeting cards. RHB also entered into licensing agreements with other companies for honey-badger costumes, toys, t-shirts, sweatshirts, posters, and decals, among other things. HBDC and HBDGS were the two most common phrases used on these licensed products. For example, two of Zazzle's best-selling honey-badger greeting cards stated on their front covers "Honey Badger Don't Care About Your Birthday."

At the same time that Gordon was negotiating licensing agreements with Zazzle and Duck, defendants began developing their own line of unlicensed honey-badger greeting cards. Beginning in June 2012, defendants sold seven different greeting cards using the HBDC or HBDGS phrases with small variations:

> • The fronts of two "Election Cards" showed a picture of a honey badger wearing a patriotic hat and stated "The Election's Coming." The inside of one card said "Me and Honey Badger don't give a $#%@! Happy Birthday," and the inside of the other said "Honey Badger and me just don't care. Happy Birthday."

- The fronts of two "Birthday Cards" featured different pictures of a honey badger and stated either "It's Your Birthday!" or "Honey Badger Heard It's Your Birthday." The inside of both cards said "Honey Badger Don't Give a S---."

- The fronts of two "Halloween Cards" showed a picture of a honey badger next to a jack-o-lantern and stated "Halloween is Here." The inside of the cards said either "Honey Badger don't give a $#*%!" or "Honey Badger don't give a s---."

- A "Critter Card" employed a Twitter-style format showing a series of messages from "Honey Badger@don'tgiveas---." The front stated "Just killed a cobra. Don't give a s---"; "Just ate a scorpion. Don't give a s---"; and "Rolling in fire ants. Don't give a s---."[3] The inside said "Your Birthday's here. . . I give a s---."

The back cover of each card displayed the mark for "Recycled Paper Greetings" and listed the websites www.DCIStudios.com and www.prgreetings.com. DCI's

---

[3] Gordon's video refers to a honey badger getting stung by bees and eating a cobra—e.g., "Now look, here's a house full of bees. You think the honey badger cares? It doesn't give a s---. . . . But look the honey badger doesn't care, it's getting stung like a thousand times. It doesn't give a s--- . . . . Look! Here comes a fierce battle between a king cobra and a honey badger. . . . And of course, what does a honey badger have to eat for the next few weeks? Cobra."

President testified that he drafted all of the cards in question but could not recall what inspired the cards' designs. He claimed to have never heard of a video involving a honey badger.

In June 2015, Gordon filed the instant action against DCI and PRG, alleging trademark infringement under the Lanham Act, among other claims. The district court granted summary judgment for defendants, holding that defendants' greeting cards were expressive works, and applying the *Rogers* test to bar all of Gordon's claims. Gordon timely appealed.[4]

## II

The Lanham Act, 15 U.S.C. § 1051 *et seq.*, "creates a comprehensive framework for regulating the use of trademarks and protecting them against infringement, dilution, and unfair competition." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010). The Act's two underlying purposes are to ensure that (1) "owners of trademarks can benefit from the goodwill associated with their marks" and (2) "consumers can distinguish among competing producers." *Id.*; *see also* J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 2:2 (5th ed.) (explaining the dual purposes of trademark law).

Under the Act, the owner of a trademark used in commerce may register the mark with the PTO. Registration is prima facie evidence of the mark's validity and of the

---

[4] We have jurisdiction under 28 U.S.C. § 1291, and we review the district court's grant of summary judgment de novo. *See Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 806 (9th Cir. 2003).

owner's exclusive right to use the mark in connection with the goods and services specified in the registration. 15 U.S.C. § 1057(b). The owner has a cause of action against any person who, without the owners's consent, "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." *Id.* § 1114(1)(a); *see also id.* § 1125(a) (providing a similar cause of action for "false designation of origin, false or misleading description of fact, or false or misleading representation of fact," irrespective of registration).

In general, we apply a "likelihood-of-confusion test" to claims brought under the Lanham Act. *Twentieth Century Fox Television v. Empire Distrib., Inc.*, 875 F.3d 1192, 1196 (9th Cir. 2017); *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 806–07 (9th Cir. 2003). The likelihood-of-confusion test requires the plaintiff to prove two elements: (1) that "it has a valid, protectable trademark" and (2) that "the defendant's use of the mark is likely to cause confusion." *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 929 (9th Cir. 2014) (alteration omitted). Ordinarily, this test "strikes a comfortable balance" between the Lanham Act and the First Amendment. *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002).

That said, where artistic expression is at issue, we have expressed concern that "the traditional test fails to account for the full weight of the public's interest in free expression." *Id.* The owner of a trademark "does not have the right to control public discourse" by enforcing his mark. *Id.* We have adopted the Second Circuit's *Rogers* test to strike an

appropriate balance between First Amendment interests in protecting artistic expression and the Lanham Act's purposes to secure trademarks rights. Under *Rogers*, we read the Act "to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Id.* at 901 (quoting *Rogers*, 875 F.2d at 999). More concretely, we apply the Act to an expressive work only if the defendant's use of the mark is (1) not artistically relevant to the work or (2) explicitly misleads consumers as to the source or the content of the work. *See id.* at 902. Effectively, *Rogers* employs the First Amendment as a rule of construction to avoid conflict between the Constitution and the Lanham Act.

We pause here to clarify the burden of proof under the *Rogers* test. The *Rogers* test requires the defendant to come forward and make a threshold legal showing that its allegedly infringing use is part of an expressive work protected by the First Amendment. If the defendant successfully makes that threshold showing, then the plaintiff claiming trademark infringement bears a heightened burden—the plaintiff must satisfy not only the likelihood-of-confusion test but also at least one of *Rogers*'s two prongs. *Cf. Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013) (if a defendant meets its "initial burden" of showing a First Amendment interest, then a public-figure plaintiff claiming defamation must meet a "heightened standard of proof" requiring a showing of "actual malice"). That is, when the defendant demonstrates that First Amendment interests are at stake, the plaintiff claiming infringement must show not only (1) that it has a valid, protectable trademark, and (2) that the defendant's use of the mark is likely to cause confusion, but also (3) that the mark is either not artistically relevant to the

underlying work *or* explicitly misleads consumers as to the source or content of the work.

"Summary judgment may properly be entered only against a party who has failed to make a showing sufficient to establish a genuine dispute as to the existence of an element essential to his case and upon which the party will bear the burden of proof at trial." *Easley v. City of Riverside*, 890 F.3d 851, 859 (9th Cir. 2018). When, as here, the defendant moves for summary judgment and has demonstrated that its use of the plaintiff's mark is part of an expressive work, the burden shifts to the plaintiff to raise a genuine dispute as to at least one of *Rogers*'s two prongs. In other words, to evade summary judgment, the plaintiff must show a triable issue of fact as to whether the mark is artistically relevant to the underlying work or explicitly misleads consumers as to the source or content of the work.

III

Before applying the *Rogers* test to the instant case, we briefly review the test's origin in the Second Circuit and development in our court.[5] We have applied the *Rogers* test on five separate occasions, and each time we have concluded that it barred the trademark infringement claim as a matter of law. Three of those cases, like *Rogers*, involved the use of a trademark in the title of an expressive work. Two cases involved trademarks in video games and extended the *Rogers*

---

[5] The *Rogers* test has been adopted in other circuits as well. *See Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*, 683 F.3d 1266, 1278 (11th Cir. 2012); *Parks v. LaFace Records*, 329 F.3d 437, 452 (6th Cir. 2003); *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 665 (5th Cir. 2000).

test to the use of a trademark in the body of an expressive work.

A

The *Rogers* case concerned the movie *Ginger and Fred*, a story of two fictional Italian cabaret performers who imitated the famed Hollywood duo of Ginger Rogers and Fred Astaire.  875 F.2d at 996–97.  Rogers sued the film's producers under the Lanham Act, alleging that the film's title gave the false impression that the film—created and directed by well-known filmmaker Federico Fellini—was about her or sponsored by her.  *Id.* at 997.  The district court, however, granted summary judgment for the defendant film producers. *Id.*

On appeal, the Second Circuit recognized that, "[t]hough First Amendment concerns do not insulate titles of artistic works from all Lanham Act claims, such concerns must nonetheless inform our consideration of the scope of the Act as applied to claims involving such titles."  *Id.* at 998.  The court said it would construe the Lanham Act "to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression."  *Id.* at 999.  Refining its inquiry, the court further held that, "[i]n the context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless [1] the title has no artistic relevance to the underlying work whatsoever, or, [2] if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work."  *Id.*

With respect to artistic relevance, the Second Circuit found that the names "Ginger" and "Fred" were "not

arbitrarily chosen just to exploit the publicity value of their real life counterparts" but had "genuine relevance to the film's story." *Id.* at 1001. The film's title was "truthful as to its content" and conveyed "an ironic meaning that [was] relevant to the film's content." *Id.* On the second prong of its inquiry, the court held that the title was not explicitly misleading because it "contain[ed] no explicit indication that Rogers endorsed the film or had a role in producing it." *Id.* Any risk that the title would mislead consumers was "outweighed by the danger that suppressing an artistically relevant though ambiguous title will unduly restrict expression." *Id.* The Second Circuit therefore affirmed summary judgment for the defendant film producers. *Id.* at 1005.

B

We first employed the *Rogers* test in *MCA Records*, 296 F.3d 894, which concerned the song "Barbie Girl" by the Danish band Aqua. The song—which lampooned the values and lifestyle that the songwriter associated with Barbie dolls—involved one band-member impersonating Barbie and singing in a high-pitched, doll-like voice. *Id.* at 899. Mattel, the manufacturer of Barbie dolls, sued the producers and distributors of "Barbie Girl" for infringement under the Lanham Act, and the district court granted summary judgment for the defendants. *Id.* Applying the *Rogers* test, we affirmed. *Id.* at 902. We held that the use of the Barbie mark in the song's title was artistically relevant to the underlying work because the song was "about Barbie and the values Aqua claims she represents." *Id.* In addition, the song "d[id] not, explicitly or otherwise, suggest that it was produced by Mattel." *Id.* "The *only* indication that Mattel might be associated with the song [was] the use of Barbie in

the title," and if the use of the mark alone were enough to satisfy *Rogers*'s second prong, "it would render *Rogers* a nullity." *Id.* Because the Barbie mark was artistically relevant to the song and not explicitly misleading, we concluded that the band could not be held liable for infringement.

We applied the *Rogers* test to another suit involving Barbie in *Walking Mountain Prods.*, 353 F.3d 792. There, photographer Thomas Forsythe developed a series of photographs titled "Food Chain Barbie" depicting Barbie dolls or parts of Barbie dolls in absurd positions, often involving kitchen appliances. *Id.* at 796. Forsythe described the photographs as critiquing "the objectification of women associated with [Barbie]." *Id.* Mattel claimed that the photos infringed its trademark and trade dress, but we affirmed summary judgment for Forsythe because "[a]pplication of the *Rogers* test here leads to the same result as it did in *MCA*." *Id.* at 807. Forsythe's use of the Barbie mark was artistically relevant to his work because his photographs depicted Barbie and targeted the doll with a parodic message. *Id.* Moreover, apart from Forsythe's use of the mark, there was no indication that Mattel in any way sponsored the photographs. *Id.*

Most recently, we applied the *Rogers* test in *Twentieth Century Fox Television*, 875 F.3d 1192. Twentieth Century Fox produced the television show *Empire*, which revolved around a fictional hip-hop record label named "Empire Enterprises." *Id.* at 1195. Empire Distribution, an actual hip-hop record label, sent Twentieth Century Fox a cease-and-desist letter, and Twentieth Century Fox sued for a declaratory judgment that its show did not violate Empire's trademark rights. *Id.* In affirming summary judgment for

Twentieth Century Fox, we rejected Empire's argument that "the *Rogers* test includes a threshold requirement that a mark have attained a meaning beyond its source-identifying function."[6]  *Id.* at 1197.  Whether a mark conveys a meaning beyond identifying a product's source is not a threshold requirement but only a relevant consideration: "trademarks that transcend their identifying purpose are more likely to be used in artistically relevant ways," but such transcendence is not necessary to trigger First Amendment protection.  *Id.* at 1198 (quotation marks and citation omitted).

We concluded that Empire could not satisfy *Rogers*'s first prong because Twentieth Century Fox "used the common English word 'Empire' for artistically relevant reasons," namely, that the show's setting was New York (the Empire State) and its subject matter was an entertainment conglomerate (a figurative empire).  *Id.*  Finally, we resisted Empire's efforts to conflate the likelihood-of-confusion test with *Rogers*'s second prong.  To satisfy that prong, it is not enough to show that "the defendant's use of the mark would confuse consumers as to the source, sponsorship or content of the work;" rather, the plaintiff must show that the defendant "*explicitly* misl[ed] consumers."  *Id.* at 1199.  Because Twentieth Century Fox's *Empire* show contained "no overt claims or explicit references to Empire Distribution," we found that Empire could not satisfy *Rogers*'s second prong.  *Id.*  Empire's inability to satisfy either of *Rogers*'s two prongs meant that it could not prevail on its infringement claim.

---

[6] We explained in *MCA Records* that trademarks sometimes "transcend their identifying purpose" and "become an integral part of our vocabulary."  296 F.3d at 900.  Examples include "Rolls Royce" as proof of quality or "Band-Aid" for any quick fix.

C

We first extended the *Rogers* test beyond a title in *E.S.S. Ent'mt 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008). In that case, defendant Rockstar Games manufactured and distributed the video game *Grand Theft Auto: San Andreas*, which took place in a fictionalized version of Los Angeles. *Id.* at 1096–97. One of the game's neighborhoods—East Los Santos—"lampooned the seedy underbelly" of East Los Angeles by mimicking its businesses and architecture. *Id.* at 1097. The fictional East Los Santos included a virtual strip club called the "Pig Pen." *Id.* ESS Entertainment 2000, which operates the Play Pen Gentlemen's Club in the real East Los Angeles, claimed that Rockstar's depiction of the Pig Pen infringed its trademark and trade dress. *Id.*

We recognized that the *Rogers* test was developed in a case involving a title, and adopted by our court in a similar case, but we could find "no principled reason why it ought not also apply to the use of a trademark in the body of the work." *Id.* at 1099. With respect to *Rogers*'s first prong, we explained that "[t]he level of relevance merely must be above zero" and the Pig Pen met this threshold by being relevant to Rockstar's artistic goal of creating "a cartoon-style parody of East Los Angeles." *Id.* at 1100. On the second prong, we concluded that the game did not explicitly mislead as to the source of the mark and would not "confuse its players into thinking that the Play Pen is somehow behind the Pig Pen or that it sponsors Rockstar's product. . . . A reasonable consumer would not think a company that owns one strip club in East Los Angeles . . . also produces a technologically sophisticated video game." *Id.* at 1100–01. Because ESS

Entertainment 2000 could not demonstrate either of *Rogers*'s two prongs, we affirmed summary judgment for Rockstar.

Another video-game case dealt with the *Madden NFL* series produced by Electronic Arts, Inc. ("EA"). *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235 (9th Cir. 2013). Legendary football player Jim Brown alleged that EA violated § 43(a) of the Lanham Act by using his likeness in its games. *Id.* at 1238–39. The district court granted EA's motion to dismiss, and we affirmed. *Id.* at 1239. We reiterated *E.S.S.*'s holding that the level of artistic relevance under *Rogers*'s first prong need only exceed zero and found it was "obvious that Brown's likeness ha[d] at least some artistic relevance to EA's work." *Id.* at 1243. We also found that Brown had not alleged facts that would satisfy *Rogers*'s second prong: "EA did not produce a game called *Jim Brown Presents Pinball* with no relation to Jim Brown or football beyond the title; it produced a football game featuring likenesses of thousands of current and former NFL players, including Brown." *Id.* at 1244. We asked "whether the use of Brown's likeness would confuse *Madden NFL* players into thinking that Brown is somehow behind the games or that he sponsors EA's product," and held that it would not. *Id.* at 1245–47 (alterations omitted). As in *E.S.S.*, the plaintiff could not satisfy either of *Rogers*'s two prongs, and judgment for the defendant was proper.

## IV

In each of the cases coming before our court, the evidence was such that no reasonable jury could have found for the plaintiff on either prong of the *Rogers* test, and we therefore concluded that the plaintiff's Lanham Act claim failed as a matter of law. This case, however, demonstrates *Rogers*'s

outer limits. Although defendants' greeting cards are expressive works to which *Rogers* applies, there remains a genuine issue of material fact as to at least *Rogers*'s first prong—i.e., whether defendants' use of Gordon's mark in their greeting cards is artistically relevant.

A

As a threshold matter, we have little difficulty determining that defendants have met their initial burden of demonstrating that their greeting cards are expressive works protected under the First Amendment. As we have previously observed, "[a greeting] card certainly evinces '[a]n intent to convey a particularized message . . . , and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.'" *Hilton v. Hallmark Cards*, 599 F.3d 894, 904 (9th Cir. 2010) (quoting *Spence v. Washington*, 418 U.S. 405, 410–11 (1974) (per curiam)); *see also Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir. 1970) (plaintiff's greeting cards, considered as a whole, "represent[ed] a tangible expression of an idea" and hence were copyrightable). Each of defendants' cards relies on graphics and text to convey a humorous message through the juxtaposition of an event of some significance—a birthday, Halloween, an election—with the honey badger's aggressive assertion of apathy. Although the cards may not share the creative artistry of Charles Schulz or Sandra Boynton, the First Amendment protects expressive works "[e]ven if [they are] not the expressive equal of *Anna Karenina* or *Citizen Kane*." *Brown*, 724 F.3d at 1241. Because defendants have met their initial burden, the burden shifts to Gordon to raise a triable issue of fact as to at least one of *Rogers*'s two prongs.

B

*Rogers*'s first prong requires proof that defendants' use of Gordon's mark was not "artistically relevant" to defendants' greeting cards. We have said that "the level of artistic relevance of the trademark or other identifying material to the work merely must be above zero." *Id.* at 1243 (quotation marks and alterations omitted). The honey-badger catchphrase is certainly relevant to defendants' cards; the phrase is the punchline on which the cards' humor turns. In six of the seven cards, the front cover sets up an expectation that an event will be treated as important, and the inside of the card dispels that expectation with either the HBDC or HBDGS phrase. The last card, the "Critter Card," operates in reverse: the front cover uses variations of the HBDGS phrase to establish an apathetic tone, while the inside conveys that the card's sender actually cares about the recipient's birthday.[7]

But the "artistic relevance" inquiry does not ask only whether a mark is relevant to the rest of the work; it also asks whether the mark is relevant to the defendant's own *artistry*. The use of a mark is artistically relevant if the defendant uses it for artistic reasons. Conversely, the use of a mark is not artistically relevant if the defendant uses it merely to appropriate the goodwill inhering in the mark or for no reason at all. *See Parks v. LaFace Records*, 329 F.3d 437, 453 (6th

---

[7] Defendants' greeting cards generally use a variation of the HBDGS phrase—a phrase that Gordon has not registered with the PTO. Although the distinction between the HBDC and HBDGS phrases may be material to what Gordon must prove under the likelihood-of-confusion test, we do not consider it relevant for determining whether he has raised a triable issue of fact as to either of *Rogers*'s two prongs.

Cir. 2003) (finding genuine issue of material fact on artistic-relevance prong, where "it would not be unreasonable to conclude that the title *Rosa Parks* is *not* relevant to the content of the song in question"). For artistic relevance to "be above zero," the mark must both relate to the defendant's work and the defendant must add his own artistic expression beyond that represented by the mark. For instance, Andy Warhol reproduced Campbell's soup cans in a literal, but artistic, form; Warhol took Campbell's mark and added his own artistic expression. No one seeing Warhol's work would think he was merely trying to appropriate the goodwill inhering in Campbell's mark; no one thought Warhol was selling soup, just art.

*Rogers* protects our First Amendment interests in artistic works, and defendants' greeting cards are among the artistic works the Amendment protects. But it cannot be that defendants can simply copy a trademark into their greeting cards without adding their own artistic expression or elements and claim the same First Amendment protection as the original artist. *Cf. Parks*, 329 F.3d at 447 ("[T]he First Amendment cannot permit anyone who cries 'artist' to have *carte blanche* when it comes to naming and advertising his or her works, art though it may be."). That would turn trademark law on its head.

Construing the facts in the light most favorable to Gordon, defendants may have merely appropriated the goodwill inhering in Gordon's mark without adding any creativity of their own. To be sure, defendants' use of the HBDC or HBDGS phrases is not a non sequitur; the phrases make sense in the context of defendants' greeting cards. But there is at least a triable issue of fact as to whether defendants added their own artistic expression, as opposed to just

copying Gordon's artistic expression. Gordon has presented evidence that he sold various products bearing his mark, including greeting cards; that his agent met with a representative of defendants' parent corporation to discuss a possible licensing deal; that shortly thereafter, defendants started developing their own line of greeting cards even though their parent corporation had rejected the proposed licensing deal; and that defendants' president, who drafted the cards, could not recall what inspired them. Moreover, the cards themselves use Gordon's catchphrases in different ways, and a jury could possibly conclude that defendants used the phrases for artistic reasons on one or more cards but not on others.

These facts distinguish this case from others in which the *Rogers* test barred an infringement claim as a matter of law. In *Rogers*, the use of Ginger Rogers's name was integral to Fellini's film. His characters were trying to be like their American idols, Ginger and Fred. The film did not appropriate Ginger's mark; it came in praise of her craft, celebrating Rogers and Astaire's "elegance and class" and contrasting it with the "gaudiness and banality of contemporary television." *Rogers*, 875 F.2d at 1001. The film's title was "not a disguised advertisement for the sale of goods or services or a collateral commercial product." *Id.* at 1004–05.

The junior users in our Barbie cases also viewed Barbie as a cultural icon, even if they did not treat her with the same adulation that Fellini did Rogers. *Walking Mountain*, 353 F.3d at 802 ("To sell its product, Mattel uses associations of beauty, wealth, and glamour. Forsythe turns this image on its head . . . [to] transform Barbie's meaning."); *MCA Records*, 296 F.3d at 901 ("The song pokes fun at Barbie and

the values that Aqua contends she represents."). In *Twentieth Century Fox*, the use of the word "Empire" as the title for the television series conveyed a raft of meanings: "Empire" was a "common English word" relevant to the show's setting (New York) and its subject matter (a music and entertainment conglomerate). 875 F.3d at 1198. And in our video game cases, the borrowed mark was part of a much larger context. In *Brown*, Jim Brown was one of "thousands of current and former NFL players" appearing in the game, 724 F.3d at 1244, while in *E.S.S.*, the Pig Pen was just one of many fictional buildings and landmarks in a "cartoon-style parody" of a neighborhood in Los Angeles, 547 F.3d at 1100.

In short, in all of our prior cases it was clear that the mark at issue was relevant to the junior user's work and that the junior user employed the mark in the junior user's own artistic expression. Here, however, there is evidence that defendants simply used Gordon's mark in the same way that Gordon was using it—to make humorous greeting cards in which the bottom line is "Honey Badger don't care." A jury could find that defendants' cards are only intelligible to readers familiar with Gordon's video and deliberately trade on the goodwill associated with his brand. Defendants have arguably not used the HBDC or HBDGS phrases in any way that distinguishes their use from Gordon's and thus have not "imbued" their product with any "expressive value" apart from that contained in Gordon's trademarked phrase. *MCA Records*, 296 F.3d at 900. We cannot resolve whether defendants' use of Gordon's mark is artistically relevant to

their cards as a matter of law. This presents a question of fact that a jury must decide.[8]

At trial, the district court should instruct the jury on the likelihood-of-confusion test, as in any infringement case. In addition, the court should instruct the jury that defendants have shown that their greeting cards are protected under the First Amendment and that Gordon must therefore prove an additional element to succeed on his claim. The jury may only find for Gordon if he proves by a preponderance of the evidence that defendants' use of his mark is (1) not artistically relevant to their greeting cards *or* (2) explicitly misleading as to the source or content of the cards. Defendants' use of the mark is artistically relevant if the mark relates to defendants' work and defendants' added their own artistic expression beyond that represented by the mark. Defendants' use of the mark is not artistically relevant if defendants merely appropriated whatever goodwill consumers associate with the mark without adding their own artistic expression or elements. Defendants' use of the mark is explicitly misleading only if it explicitly misleads consumers into believing that Gordon sponsored or is somehow associated with defendants' cards. Simply using the mark is not enough. There must be something else about

---

[8] In light of our holding, we need not reach *Rogers*'s second prong—i.e., whether defendants' use of the mark is explicitly misleading. As discussed above, Gordon need only raise a triable issue of fact as to one of *Rogers*'s prongs to evade summary judgment. To succeed on his Lanham Act claim at trial, he will need to prove both a likelihood of confusion and at least one of *Rogers*'s prongs. That is, he will need to prove either a likelihood of confusion and the absence of any artistic relevance *or* a likelihood of confusion and that defendants' use of the mark is explicitly misleading.

the cards that explicitly misleads consumers into believing that Gordon sponsored or is associated with the cards.[9]

V

For the foregoing reasons, we **REVERSE** and **REMAND** to the district court for further proceedings consistent with this opinion.

---

[9] We note that the district court has not yet addressed the likelihood-of-confusion test or defendants' abandonment defense. We express no opinion on those issues and leave them for the district court to address in the first instance.